# Exhibit 1

**NAGEL RICE, LLP**
Jay J. Rice, Esq.
Attorney ID: 020691977
103 Eisenhower Parkway
Roseland, NJ 07068
(973) 618-0400
Attorneys for Plaintiffs *(Pro Se)*

|  |  |
|---|---|
| NAGEL RICE, LLP,              : | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY |
|       Plaintiffs,     : | DOCKET NO. L-3337-16 |
| vs.                : | Civil Action |
| ALLIED WORLD INSURANCE<br>COMPANY,          : | **SUMMONS** |
|      Defendants.    : |  |

To The Defendant(s) Named Above:    ALLIED WORLD INSURANCE COMPANY
199 Water Street, 24th Floor
New York, New York 10038
NAIC No. 22730

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New

Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute

this complaint, you or your attorney must file a written answer or motion and proof of service with

the deputy clerk of the Superior Court in the county listed above within 35 days from the date you

received this summons, not counting the date you received it. (The address of each deputy clerk

of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your

written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice

Complex, CN 971, Trenton, New Jersey 08625. A filing fee payable to the Treasurer, State of

New Jersey and a completed Case Information Statement (available from the deputy clerk of the

Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to the plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-Law (1-888-576-5529).

A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

MICHELLE M. SMITH, ESQ.
Acting Clerk of the Superior Court

Dated: May 25, 2016

Name of Defendant to be Served: Allied World Insurance Company
Address of Defendant to be Served: 199 Water Street, 24th Floor
New York, NY 10038
NAIC No. 22730

NOTE: The Case Information Statement is available at www.njcourts.com

2

**Appendix XII-B1**

| CIVIL CASE INFORMATION STATEMENT (CIS)<br><br>Use for initial Law Division<br>Civil Part pleadings (not motions) under *Rule* 4:5-1<br>**Pleading will be rejected for filing, under *Rule* 1:5-6(c),<br>if information above the black bar is not completed<br>or attorney's signature is not affixed** | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|
| | PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| | CHG/CK NO. |
| | AMOUNT: |
| | OVERPAYMENT: |
| | BATCH NUMBER: |

| ATTORNEY / PRO SE NAME<br>Jay J. Rice, Esq. | TELEPHONE NUMBER<br>(973) 618-0400 | COUNTY OF VENUE<br>Essex |
|---|---|---|
| FIRM NAME (If applicable)<br>Nagel Rice, LLP | | DOCKET NUMBER (when available)<br>L - 3387-16 |
| OFFICE ADDRESS<br>103 Eisenhower Parkway<br>Roseland, NJ 07068 | | DOCUMENT TYPE<br>Complaint for Declaratory Judgment |
| | | JURY DEMAND   ☐ YES   ■ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>Plaintiff, Nagel Rice, LLP (Pro Se) | CAPTION<br>Nagel Rice, LLP v. Allied World Insurance Company |
|---|---|

| CASE TYPE NUMBER<br>(See reverse side for listing) | HURRICANE SANDY<br>RELATED?<br>☐ YES   ■ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ■ NO<br><br>IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
|---|---|---|
| RELATED CASES PENDING?<br>■ YES   ☐ NO | | IF YES, LIST DOCKET NUMBERS<br>St. Louis, LLC v. Nagel Rice, LLP, Docket No. L-389-16 |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ YES   ■ No | | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)<br>☐ NONE<br>■ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION | |
|---|---|
| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?<br>■ YES   ☐ No | IF YES, IS THAT RELATIONSHIP:<br>☐ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain)<br>☐ FAMILIAL   ■ BUSINESS |
| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ☐ YES   ■ No | |

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ YES   ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED?<br>☐ YES   ■ NO | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:

**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

---

CASE TYPES (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**

| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | BOOK ACCOUNT (debt collection matters only) |
| 505 | OTHER INSURANCE CLAIM (including declaratory judgment actions) |
| 506 | PIP COVERAGE |
| 510 | UM or UIM CLAIM (coverage issues only) |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (summary action) |
| 999 | OTHER (briefly describe nature of action) |

**Track II - 300 days' discovery**

| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (other than CEPA or LAD) |
| 599 | CONTRACT/COMMERCIAL TRANSACTION |
| 603N | AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold) |
| 603Y | AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold) |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE – PROPERTY DAMAGE |
| 621 | UM or UIM CLAIM (includes bodily injury) |
| 699 | TORT – OTHER |

**Track III - 450 days' discovery**

| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 602 | ASSAULT AND BATTERY |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**

| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 513 | COMPLEX CONSTRUCTION |
| 514 | INSURANCE FRAUD |
| 620 | FALSE CLAIMS ACT |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 271 | ACCUTANE/ISOTRETINOIN | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 291 | PELVIC MESH/GYNECARE |
| 278 | ZOMETA/AREDIA | 292 | PELVIC MESH/BARD |
| 279 | GADOLINIUM | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 282 | FOSAMAX | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 299 | OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR |
| 287 | YAZ/YASMIN/OCELLA | 300 | TALC-BASED BODY POWDERS |
| 288 | PRUDENTIAL TORT LITIGATION | 601 | ASBESTOS |
| 289 | REGLAN | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category**      ☐ **Putative Class Action**      ☐ **Title 59**

**NAGEL RICE, LLP**
Jay J. Rice, Esq.
Attorney ID: 020691977
103 Eisenhower Parkway
Roseland, NJ 07068
(973) 618-0400
Attorneys for Plaintiffs *(Pro Se)*

---

|  |  |
|---|---|
| NAGEL RICE, LLP, | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY |
| Plaintiffs, | DOCKET NO. L __ ?3 7 - 16 |
| vs. | Civil Action |
| ALLIED WORLD INSURANCE<br>COMPANY, | **COMPLAINT FOR<br>DECLARATORY JUDGMENT** |
| Defendants. | |

---

Plaintiffs, Nagel Rice, LLP, with a business address at 103 Eisenhower Parkway, Roseland, New Jersey, by way of Complaint against the defendants say:

### FACTS COMMON TO ALL COUNTS

1.     At all times relevant hereto, plaintiff, Nagel Rice, LLP, is a law firm located at 103 Eisenhower Parkway, Roseland, New Jersey 07068 ("NR").

2.     At all times relevant hereto, defendant, Allied World Insurance Corporation (hereinafter "Allied") with a principal place of business located at 1690 New Britain Avenue, Suite 101, Farmington, Connecticut, issued and a professional liability insurance policy to NR for the policy period January 21, 2016 to January 21, 2017 ("the Policy"). A copy of the declaration page for that policy is attached hereto and incorporated herein as Exhibit A.

## COUNT ONE

### DECLARATORY JUDGMENT

3.     Plaintiffs repeat and reallege each and every allegation contained herein as if fully set forth herein.

4.     On or about March 18, 2016, plaintiff was notified of an alleged legal malpractice claim asserted by St. Louis, LLC and John Bolton arising out of events that took place in 2010. (Exhibit B).

5.     The claim asserted against Nagel Rice is the subject of litigation entitled, St. Louis, LLC v. Nagel Rice, LLP, pending in the Union County Superior Court, New Jersey, under Docket No. L-389-16. A true copy of the complaint filed in that matter is attached incorporated hereto as Exhibit C.

6.     A controversy exists over coverage under the Policy.

7.     Allied, by letter dated April 8, 2016, has denied coverage to Nagel Rice (Exhibit D).

8.     By reason of the foregoing, a declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exists between the plaintiff and defendant in connection with the aforementioned Policy.

9.     Plaintiff is entitled to recover their reasonable attorneys' fees incurred herein.

WHEREFORE, Plaintiffs respectfully requests the Court enter judgment as follows:

a)     For judgment declaring the defendant Allied World's policy, covers NR for all claims arising in the matter asserted in the St. Louis litigation.

b)     Attorneys' fees;

c)      Any and all other relief that this court deems just and proper under the circumstances.

**NAGEL RICE, LLP**
Attorneys for Plaintiffs

By:_____
        JAY J. RICE

Dated: May 5, 2016

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to New Jersey Court Rule 4:10-2(b), demand is made that defendant disclose to plaintiff's attorney whether or not there are any other insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide plaintiffs' attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary coverage, but also any and all excess, catastrophe and umbrella policies.

## DESIGNATION OF TRIAL COUNSEL

Jay J. Rice, Esq. is hereby designated as trial counsel in the above captioned matter.

**NAGEL RICE, LLP**
Attorneys for Plaintiffs

By:_____
        JAY J. RICE

Dated: May 5, 2016

3

## RULE 4:5-1 CERTIFICATION

I hereby certify that the matter in controversy is the subject of another action pending in the Superior Court of New Jersey, Union County, under Docket No. L-389-16 entitled St. Louis v. Nagel Rice, LLP, et als.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

NAGEL RICE, LLP
Attorneys for Plaintiffs

By: _____
        JAY J. RICE

Dated:  May 5, 2016

4

# EXHIBIT A



### ALLIED WORLD INSURANCE COMPANY
1690 New Britain Avenue, Suite 101, Farmington, CT 06032
Tel. (860) 284-1300 Fax (860) 284-1301

### ALLIED WORLD *LPL ASSURE*
### LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

**POLICY NUMBER: 0309-9751**          **RENEWAL OF:**

THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD, AND REPORTED IN ACCORDANCE WITH SECTION V.E. OF THE POLICY.  ONCE THE LIABILITY LIMITS HAVE BEEN EXHAUSTED BY DAMAGES, THE INSURER HAS NO FURTHER OBLIGATION.  PLEASE READ THE ENTIRE POLICY CAREFULLY.

## DECLARATIONS

**Item 1.   Name and Mailing Address of Named Insured:**

Nagel Rice, LLP
103 Eisenhower Parkway, Suite 103
Roseland, NJ 07068

**Item 2.   Policy Period:**

(a) Inception Date:     January 21, 2016
(b) Expiration Date:    January 21, 2017
                        **At 12:01 a.m. Standard Time at the Mailing Address Shown Above**

**Item 3.   Limits of Liability:**

**I.     Limits of Liability for Insuring Agreements**

    (a)     $2,000,000  Limit of Liability for each and every Claim under Insuring Agreement I.

    (b)     $2,000,000  Limit of Liability for all Claims under Insuring Agreement I.

**II.    Limits of Liability for Additional Coverages**

    (a)     $25,000  Shared Aggregate Limit of Liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage.

    (b)     $500,000  Limit of Liability for each and every Claim under Additional Coverage B., Non-Profit Directors & Officers Coverage.

LPL 00001 29 (11/2013)

$500,000  Limit of Liability for all Claims under Additional Coverage B., Non-Profit Directors & Officers Coverage.

(c)   $30,000  Limit of Liability for all personal earnings, under Additional Coverage C.; provided that this Limit of Liability is further limited as follows:

(i)     $500 for personal earnings lost each day

(ii)    $15,000 for personal earnings per Claim

(d)   $20,000 Limit of Liability for all fees, costs and expenses incurred from each and every Disciplinary Proceeding under Additional Coverage D.

$60,000 Limit of Liability for all fees, costs and expenses incurred from all Disciplinary Proceedings under Additional Coverage D.

(e)   $5,000 Limit of Liability for all fees and costs incurred from the Insured receiving a Subpoena arising out of Legal Services under Additional Coverage E.

**III.    Policy Aggregate Limit of Liability**

(a)   $2,000,000 Aggregate Limit of Liability for all amounts payable under Insuring Agreement I. and Additional Coverages A. and B.  The Aggregate Limit of Liability does not apply to the Additional Coverages C., D. and E.

**Item 4.    Retentions:**

(a)   $50,000  each and every Claim under Insuring Agreement I.

(b)   $5,000  each and every Material Event; each and every Privacy Wrongful Act; and each and every Data Breach under Additional Coverage A.

(c)   $50,000  each and every Claim under Additional Coverage B.

No Retention shall apply to Additional Coverages C., D. and E.

**Item 5.    Address of Insurer For Notices Under This Policy:**

Claim-Related Notices:
noticeofloss@awac.com

All Other Notices:
1690 New Britain Avenue Farmington, CT 06032

**Item 6.    Premium:**               **$71,672.00**

LPL 00001 29 (11/2013)

Item 7.   Retroactive Date:          None - Prior Acts Coverage Provided

Item 8.   Endorsements Attached at Issuance:
1. LPL 00032 29 (11/2013) New Jersey Amendatory
2. LPL 00051 29 (11/2013) New Jersey Amendatory Endorsement - Payment of Claim Expenses for Policies with Limits of Liability of $1,000,000 or More
3. LPL 00058 00 (11/2013) Retention Applies to Damages Only
4. LPL 00060 00 (11/2013) Amend Selection of Defense Counsel

In Witness Whereof, the **Insurer** has caused this Policy to be executed and attested. This Policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.

President                              Asst. Secretary

**AUTHORIZED REPRESENTATIVE**

LPL 00001 29 (11/2013)

ENDORSEMENT NO. 1

NEW JERSEY STATE AMENDATORY

This Endorsement, effective at 12:01 a.m. on January 21, 2016, forms part of

| | |
|---|---|
| Policy No. | 0309-9751 |
| Issued to | Nagel Rice, LLP |
| Issued by | Allied World Insurance Company |

To be attached to and form a part of all Lawyers Professional Liability Policies written in the State of New Jersey.

In consideration of the premium charged, it is hereby understood and agreed that:

1.  Section II. DEFINITIONS, Subsection C., "Claim" is amended to read as follows:

    C.  **CLAIM** means:

        1.  any written notice or demand for monetary relief or **Legal Services**; or
        2.  any civil proceeding in a court of law;
        3.  any administrative proceeding, other than a **Disciplinary Proceeding**; or

        made to or against any **Insured** seeking to hold such **Insured** responsible for damages for a **Wrongful Act**.

        A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

        A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim**.

2.  Section III. DEFINITIONS, Subsection G., "**Damages**" is amended to read as follows:

    G.  **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre-judgment interest. **Damages** shall not include:

        1.  criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

        2.  punitive, exemplary or the multiplied portion of multiple damages;

        3.  amounts deemed uninsurable by law;

        4.  the return or restitution of legal fees, costs and expenses, no matter how claimed;

        5.  amounts paid or incurred by an **Insured** to comply with a judgment or settlement for any form of equitable or non-monetary relief; or

6.    amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

3.    Section V. CONDITIONS, Subsection F. EXTENDED REPORTING PERIOD OPTIONS, paragraph 5(a) is amended to read as follows:

(a)    The right to any of the Extended Reporting Period Endorsement options is not available to any **Insured** if:

(i)    there is a misrepresentation in the **Application** or the failure to comply with the terms and conditions of this Policy; or

(ii)    the **Insured's** right or license to practice law is suspended, surrendered or revoked.

4.    Section V. CONDITIONS, Subsection J. CANCELLATION; NO OBLIGATION TO RENEW, is amended to read as follows:

J.    **CANCELLATION; NO OBLIGATION TO RENEW**

**CANCELLATION:**

1.    This Policy shall terminate upon the Expiration Date set forth in Item 2. of the Declaration, or upon any earlier cancellation.

2.    This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect. If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

3.    CANCELLATION BY THE INSURER IF POLICY IS IN EFFECT FOR LESS THAN SIXTY (60) DAYS

If this policy has been in effect for less than sixty (60) days, the **Insurer** may cancel this policy by mailing to the **Named Insured** and any person entitled to notice under the policy written notice of cancellation at least:

(a)    Ten (10) days before the effective date of cancellation if the Policy is cancelled for:

(i)    Nonpayment of premium; or

(ii)    Existence of a moral hazard as defined in N.J.A.C. 11:1-20.2(f), as follows:

The risk, danger, or probability that the **Insured** will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. Any change in the circumstances of an **Insured** that will increase the probability of

such destruction may be considered a moral hazard; and

The substantial risk, danger, or probability that the character, circumstances, or personal habits of the **Insured** may increase the possibility of loss or liability for which the **Insurer** will be held responsible. Any change in the character or circumstances of an individual, corporate, partnership, or other **Insured** that will increase the probability of such loss or liability may be considered a moral hazard.

(b)     Thirty (30) days before the effective date of cancellation if the Policy is cancelled for any other reason.

4.     CANCELLATION BY THE INSURER IF POLICY IS IN EFFECT FOR SIXTY (60) DAYS OR MORE, OR IS A RENEWAL

Pursuant to New Jersey law, if this policy has been in effect for more than sixty (60) days or is a renewal policy, it cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious, or unfairly discriminatory or without adequate prior notice to the **Named Insured**. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the **Insured** and/or the **Insured's** lawful representative upon written request.

If this policy has been in effect for sixty (60) days or more or is a renewal of a policy the **Insurer** issued, this policy may be cancelled by the **Insurer** only for one or more of the following reasons:

(a)     Nonpayment of premium;

(b)     Existence of a moral hazard as defined in N.J.A.C. 11:1-20.2(f) and described above;

(c)     Material misrepresentation or nondisclosure to the **Insurer** of a material fact at the time of acceptance of the risk.

(d)     Increased hazard or material change in the risk assumed which the **Insurer** could not have reasonably contemplated at the time of assumption of the risk;

(e)     Substantial breaches of contractual duties, conditions, or warranties that materially affect the nature and/or insurability of the risk;

(f)     Lack of cooperation from the **Insured** on loss control matters materially affecting insurability of the risk;

(g)     Fraudulent acts against the **Insurer** by the **Insured** or its representative that materially affect the nature of the risk insured;

(h)     Loss of or reduction in available insurance capacity;

(i)     Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract or any subsequent renewal;

(j)     Loss of or substantial changes in applicable reinsurance;

(k)     Failure by the **Insured** to comply with any federal, state, or local fire, health, safety, building or construction regulation, law, or ordinance with respect to an insured risk which substantially increases any hazard

insured against within sixty (60) days of written notification of a violation of any such law, regulation, or ordinance;

(l)     Failure by the **Insured** to provide reasonable and necessary underwriting information to the **Insurer** upon written request therefore and a reasonable opportunity to respond;

(m)    Agency termination, provided:

    (i)     The **Insurer** documents that replacement coverage at comparable rates and terms has been provided to the **Named Insured** and the **Insurer** has informed the **Named Insured** in writing of the right to continue coverage with the **Insurer**; or

    (ii)    The **Insurer** has informed the **Named Insured** in writing of the right to continue coverage with the **Insurer** and the **Named Insured** has agreed in writing to the cancellation or nonrenewal based on the termination of the **Named Insured's** appointed agent; or

(n)     Any other reason in accordance with the **Insurer's** underwriting guidelines for cancellation of commercial lines coverage, provided such guidelines are not arbitrary, capricious or unfairly discriminatory.

5.     If this policy is cancelled by the **Insurer** based on reason 4(a) or 4(b) above, the **Insurer** shall mail a written notice of cancellation to the **Named Insured** and any person entitled to notice under the policy at least ten (10) days before the effective date of cancellation.  For cancellation due to the nonpayment of premium, the notice shall state the effect of nonpayment by the due date. Cancellation for nonpayment of premium shall not be effective if payment of the amount due is made prior to the effective date set forth in the notice.

6.     If this policy is cancelled by the **Insurer** for any other reason listed above, the **Insurer** shall mail a written notice of cancellation to the **Named Insured** and any person entitled to notice under this policy not less than thirty (30) days or more than one hundred and twenty (120) days before the effective date of such cancellation.

7.     If the **Insurer** cancels this policy for any reason other than nonpayment of premium, the earned premium shall be computed on a pro rata basis.  Premium adjustment may be made either at the time cancellation is effected or as soon as practicable thereafter.  However, payment or tender of unearned premium is not a condition of cancellation by the **Insurer**.  Notwithstanding the foregoing if any **Insured** notifies the **Insurer** of any **Claim** or circumstance which may give rise to a **Claim** under this policy during the **Policy Period** prior to cancellation, all premium will be considered earned at the time of such notification and no premium will be returned to the **Named Insured**.

### RENEWAL AND NONRENEWAL:

1.     The **Insurer** may elect not to renew this policy for any reason set forth in Paragraph J.4. above.  If the **Insurer** elects not to renew this policy, the **Insurer** shall mail a notice of nonrenewal to **Named Insured** at least thirty (30) days but not more than one hundred and twenty (120) days before the expiration date of this policy.  If this policy does not have a fixed expiration date, it shall be

deemed to expire annually on the anniversary of its inception.

2.  Written notice of the amount of the renewal premium and any change in policy terms must be given to the **Named Insured** at least thirty (30) days but not more than one hundred and twenty (120) days prior to the due date of the premium and must clearly state the effect of nonpayment of the premium by the due date.

3.  If the **Insurer** fails to send a notice of nonrenewal or a notice of the amount of the renewal premium and any change in policy terms, the **Named Insured** shall be entitled to continue the expiring policy at the same terms and premium until such time as the **Insurer** shall send appropriate notice.

NOTICES OF CANCELLATION AND NONRENEWAL:

1.  All notices of cancellation and nonrenewal must contain the standard or reason upon which the termination is premised and specify in detail the factual basis upon which the **Insurer** relied.

2.  All notices of cancellation and nonrenewal, except those for nonpayment of premium, must contain a statement which shall be clearly and prominently set out in boldface type or other manner which draws the reader's attention advising the **Named Insured** that the **Named Insured** may file a written complaint about the cancellation or nonrenewal with the New Jersey Department of Banking and Insurance, Division of Enforcement and Consumer Protection, PO Box 325, Trenton, New Jersey 08625.  The statement also shall advise the **Named Insured** to contact the Department of Banking and Insurance immediately, in the event the **Named Insured** wishes to file a complaint.

3.  All notices of cancellation and nonrenewal shall be sent to the **Named Insured** at the last mailing address known to the **Insurer** by:

    (a)  Certified mail; or

    (b)  First class mail, if the **Insurer** has obtained from the post office a date stamped proof of mailing showing the **Named Insured's** name and address, and the **Insurer** has retained a duplicate copy of the mailed notice.

4.  The **Insurer** need not provide notice of cancellation or nonrenewal if the **Named Insured** has:

    (a)  Replaced coverage elsewhere; or

    (b)  Specifically requested termination.

5.  Section V. CONDITIONS, Subsection B., RETENTION is amended to read as follows:

B.  **RETENTION**

1.  With respect to the coverage provided under Insuring Agreement I., the

Insurer's obligation to pay **Damages** is in excess of the Retention set forth in Item 4.(a) of the Declarations, which Retention shall apply to each and every **Claim**.

2. With respect to the coverage provided under Section II. Additional Coverage A., the **Insurer's** obligation to pay any amounts payable is in excess of the Retention set forth in Item 4.(b) of the Declarations, which Retention shall apply to each and every event giving rise to coverage under this Section II.A.

3. With respect to the coverage provided under Section II. Additional Coverage B., the **Insurer's** obligation to pay **Damages** is in excess of the Retention set forth in Item 4.(c) of the Declarations, which Retention shall apply to each and every **Claim**.

4. A Retention shall only apply to an Additional Coverage where so indicated on the Declarations.

5. It is the **Named Insured's** responsibility to pay **Damages** or any other amounts payable under this Policy up to the amount of the Retention. The **Insurer** shall only be liable to pay, subject to the Limit of Liability provisions stated in this Section, for **Damages** or any other amounts payable under this Policy in excess of such Retention and such Retention shall not be insured under this Policy.

6. Solely at the option of the **Insurer**, the **Insurer** may advance all or some portion of the Retention amount in the event that the **Named Insured** fails to do so in a timely manner. In such event, the **Named Insured** shall pay back the Retention to the **Insurer** no later than fifteen (15) days after demand by the **Insurer**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

ENDORSEMENT NO. 2

NEW JERSEY AMENDATORY ENDORSEMENT
PAYMENT OF CLAIMS EXPENSES
FOR POLICIES WITH LIMITS OF LIABILITY OF $1,000,000 OR MORE

This Endorsement, effective at 12:01 a.m. on January 21, 2016, forms part of

Policy No.      0309-9751
Issued to       Nagel Rice, LLP
Issued by       Allied World Insurance Company

In consideration of the premium charged, it is hereby agreed:

1.  Section V. CONDITIONS, Subsection A. is hereby deleted in its entirety and replaced as follows:

A.  **LIMIT OF LIABILITY**

Regardless of the number of **Claims**, claimants, **Material Events**, **Privacy Wrongful Acts**, **Data Breaches** or other matters giving rise to coverage under this Policy, or the number of persons or entities included within the definition of **Insured**, the **Insurer's** liability is limited as follows:

1.  Limit of Liability for Insuring Agreements and Additional Coverages

(a)  Payment of **Damages** and other amounts payable:

(i)  Insuring Agreement I

The Limit of Liability set forth in Item 3.I.(a) of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. for all **Damages** resulting from each **Claim** for **Legal Services Wrongful Acts**, **Privacy Wrongful Acts** and **Network Security Wrongful Acts**, subject to paragraph 2. of this Section V.A.

The Aggregate Limit of Liability for Insuring Agreement I. of this Policy, as set forth in Item 3.I.(b) of the Declarations, is the **Insurer's** maximum liability for all **Damages** resulting from all **Claims** for **Legal Services Wrongful Acts**, **Privacy Wrongful Acts** and **Network Security Wrongful Acts**, subject to paragraph 2. of this Section V.A.

(ii)  Additional Coverage A

The Shared Aggregate Limit of Liability, as set forth in Item 3.II.(a) of the Declarations, is the **Insurer's** maximum liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage.

(iii)   Additional Coverage B

The Limits of Liability, as set forth in Item 3.II.(b) of the Declarations is the **Insurer's** maximum liability for all **Damages** resulting from each and every **Claim** and all **Claims** for **Non-Profit Director or Officer Wrongful Acts.**

(iv)   Additional Coverages C, D and E

The Limits of Liability, as set forth in Items 3.II.(c) – 3.II.(e) of the Declarations, is the **Insurer's** maximum liability for Additional Coverages C, D and E. Any amounts paid under these Additional Coverages are in addition to the Policy Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations.

2.   Payment of **Claims Expenses:**

(a)   **Claims Expenses** shall not reduce the Limit of Liability set forth in Item 3.I.(a) of the Declarations until **Claims Expenses** have been incurred in an amount that equals or exceeds fifty (50%) percent of   the Limit of Liability set forth in Item 3.I.(a). The Limit of Liability set forth in Items 3.I.(a) may be reduced only by the portion of incurred **Claims Expenses** greater than fifty percent (50%) of the Limit of Liability set forth in Items 3.I.(a).

(b)   The Limit of Liability set forth in Item 3.I.(a) of the Declarations shall not be reduced to an amount less than fifty percent (50%) of such Limit of Liability, regardless of the amount of **Claims Expenses** incurred.  In the event that up to fifty percent (50%) of the Limit of Liability set forth in Item 3.I.(a) is exhausted by the payment of **Claims Expenses** in connection with any one **Claim**, the remaining percentage shall be applicable only to the payment of **Damages**, and the **Insurer** shall be liable for additional **Claims Expenses** incurred in connection with that **Claim** exceeding that percentage, subject to paragraphs 3. and 4. of this Section V.A.

3.   Policy Aggregate Limit of Liability

The Policy Aggregate Limit of Liability for this Policy, as set forth in Item 3.III.(a) of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. and Section II., Additional Coverages A and B. for all **Damages,** and for **Claim Expenses** paid by the **Insurer** pursuant to paragraph 2.(b) of this Section V.A., resulting from all **Claims** to which this Policy applies.

4.   Exhaustion of Limit of Liability

The **Insurer** shall not be obligated to pay any **Damages** or **Claim Expenses** or to defend or continue to defend any **Claim** after the Limit of Liability set forth in

Item 3.I.(b) has been exhausted as set forth in this Section.  In such case, the **Insurer** shall have the right to withdraw from the further investigation or defense of any pending **Claim** by tendering control of such investigation or defense to the **Named Insured** and the **Named Insured** agrees, as a condition to the issuance of this policy, to accept such tender and proceed solely at its own cost and expense.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

ENDORSEMENT NO. 3

RETENTION APPLIES TO DAMAGES ONLY

This Endorsement, effective at 12:01 a.m. on January 21, 2016, forms part of

| | |
|---|---|
| Policy No. | 0309-9751 |
| Issued to | Nagel Rice, LLP |
| Issued by | Allied World Insurance Company |

In consideration of the premium charged, it is hereby agreed that Section V. CONDITIONS, Subsection B. is amended to read as follows:

B.     **RETENTION**

1.     With respect to the coverage provided under Insuring Agreement I., the **Insurer's** obligation to pay **Damages** is in excess of the Retention set forth in Item 4.(a) of the Declarations, which Retention shall apply to each and every **Claim**. No retention shall apply to the payment of **Claim Expenses**.

2.     With respect to the coverage provided under Section II. Additional Coverage A., the **Insurer's** obligation to pay any amounts payable is in excess of the Retention set forth in Item 4.(b) of the Declarations, which Retention shall apply to each and every event giving rise to coverage under this Section II.A.

3.     With respect to the coverage provided under Section II. Additional Coverage B., the **Insurer's** obligation to pay **Damages** is in excess of the Retention set forth in Item 4.(c) of the Declarations, which Retention shall apply to each and every **Claim**. No retention shall apply to the payment of **Claim Expenses**.

4.     A Retention shall only apply to an Additional Coverage where so indicated on the Declarations.

5.     It is the **Named Insured's** responsibility to pay **Damages** or any other amounts payable up to the amount of the Retention. The **Insurer** shall only be liable to pay, subject to the Limit of Liability provisions stated in this Section, for **Damages** or any other amounts payable under this Policy in excess of such Retention and such Retention shall not be insured under this Policy.

6.     Solely at the option of the **Insurer**, the **Insurer** may advance all or some portion of the Retention amount, in the event that the **Named Insured** fails to do so in a timely manner. In such event, the **Named Insured** shall pay back the Retention to the **Insurer** no later than fifteen (15) days after demand by the **Insurer**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

LPL 00058 00 (11/2013)

_____

Authorized Representative

**ENDORSEMENT NO. 4**

**AMEND SELECTION OF DEFENSE COUNSEL**

This Endorsement, effective at 12:01 a.m. on January 21, 2016, forms part of

|  |  |
|---|---|
| Policy No. | 0309-9751 |
| Issued to | Nagel Rice, LLP |
| Issued by | Allied World Insurance Company |

In consideration of the premium charged, it is hereby agreed that Section V. CONDITIONS, Subsection C.1. is amended to read as follows:

1.  The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy. The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**. However, the **Insurer** shall not select defense counsel without the consent of the **Named Insured**, such consent not to be unreasonably withheld.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

LPL 00060 00 (11/2013)


**ALLIED WORLD**
ASSURANCE COMPANY

### ALLIED WORLD INSURANCE COMPANY
1690 New Britain Avenue, Suite 101, Farmington, CT 06032

### ALLIED WORLD *LPL ASSURE*
### LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

## TABLE OF CONTENTS

| | |
|---|---|
| I.   INSURING AGREEMENT | 1 |
| Legal Services Wrongful Act Coverage | 1 |
| Privacy Wrongful Act Coverage | 1 |
| Network Security Wrongful Act Coverage | 1 |
| | |
| II.  ADDITIONAL COVERAGES | 2 |
| Supplemental Privacy Coverage | 2 |
| Crisis Management Coverage | 2 |
| Notification and Credit Monitoring Coverage | 2 |
| Data Forensics Coverage | 3 |
| Non-Profit Director and Officer Coverage | 3 |
| Lost Earnings Coverage | 4 |
| Disciplinary Proceedings Coverage | 4 |
| Subpoena Coverage | 4 |
| | |
| III. DEFINITIONS | 5 |
| | |
| IV.  EXCLUSIONS | 11 |
| What This Policy Does Not Cover | 11 |
| Innocent Insured Provision | 12 |
| | |
| V.   CONDITIONS | 14 |
| Limit of Liability | 14 |
| Retention | 16 |
| Defense and Settlement of Claims | 16 |
| Multiple Policies | 17 |
| Notice of Claims and Circumstances | 17 |
| Extended Reporting Period Options | 18 |
| Policy Territory | 22 |
| Assistance and Cooperation of the Insured | 22 |
| Subrogation | 22 |
| Cancellation; No Obligation to Renew | 23 |
| Change in Risk | 23 |
| Other Insurance | 24 |
| Assignment | 24 |
| Legal Action Against the Insured | 24 |
| Application | 24 |
| Changes | 25 |
| Waiver | 25 |
| Entire Agreement | 25 |
| Headings | 25 |


**ALLIED WORLD**
**ASSURANCE COMPANY**

**ALLIED WORLD INSURANCE COMPANY**
1690 New Britain Avenue, Suite 101, Farmington, CT 06032
Tel. (860) 284-1300 · Fax (860) 284-1301

## ALLIED WORLD *LPL ASSURE*
## LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

I. **INSURING AGREEMENT**

The **Insurer** will pay on behalf of an **Insured**, subject to the applicable Limit of Liability set forth in Item 3.I. of the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out any of the following **Wrongful Acts** by an **Insured** first made during the **Policy Period** or any Extended Reporting Period:

A.   Legal Services **Wrongful Act**

B.   Privacy **Wrongful Act**

C.   Network Security **Wrongful Act**

It is a condition precedent to coverage under this Policy that any **Wrongful Act** upon which a **Claim** is based occurred:

1.   during the **Policy Period**; or

2.   on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

    (a)   the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and

    (b)   prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

    (c)   there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

Subject to the applicable Limit of Liability set forth in the Declarations, the **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

II.  **ADDITIONAL COVERAGES**

A.  Supplemental Privacy Coverage

1  Crisis Management Coverage

The **Insurer** shall reimburse the **Named Insured**, subject to the Limit of Liability set forth in Item 3.II.(a) of the Declarations and the applicable Retention, those **Crisis Management Expenses** incurred by the **Named Insured** in connection with **Material Events** which first take place or are reasonably anticipated to first take place during the **Policy Period**.

As a condition precedent to coverage under this Additional Coverage A.1.:

(a)  The public relations firm, crisis management firm or law firm selected by the **Named Insured** to perform services must be approved in writing by the **Insurer**, prior to the **Named Insured** incurring any **Crisis Management Expenses**;

(b)  The actual or anticipated **Material Event** shall be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the termination of the **Policy Period**; and

(c)  **Crisis Management Expenses** must be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the **Named Insured** first incurs such **Crisis Management Expenses**.

2.  Notification and Credit Monitoring Costs Coverage

The **Insurer** shall reimburse the **Named Insured**, subject to the Limit of Liability set forth in Item 3.II.(a) of the Declarations and the applicable Retention, the costs incurred by the **Named Insured** for notification to, and for credit monitoring of, any third parties, arising from a **Privacy Wrongful Act**, which takes place during the **Policy Period**.

Such costs may be incurred by the **Named Insured** pursuant to a U.S. federal or state statute.  Such costs are not eligible for coverage under this Additional Coverage A.2. in the event such costs are covered as **Damages** under Insuring Agreement I.B.

As a condition precedent to coverage under this Additional Coverage A.2.:

(a)  Any notification or credit monitoring costs incurred pursuant to a statutory mandate by the **Named Insured** arising from a **Privacy Wrongful Act** must be reported to the **Insurer** as soon as practicable after the **Privacy Wrongful Act** takes place, but in no event later than thirty (30) days after the **Named Insured** first incurs such costs.

3.     Data Forensics Coverage

The **Insurer** shall reimburse the **Named Insured**, subject to the Limit of Liability set forth in Item 3.II.(a) of the Declarations and the applicable Retention, for **Data Forensic Expenses** incurred by the **Named Insured** in connection with a **Data Breach** which first occurs during the **Policy Period** and which the **Insured** reasonably believes might result in a **Claim** for a **Privacy Wrongful Act** or a **Network Security Wrongful Act**.

Such costs are not eligible for coverage under this Additional Coverage A.3. in the event such costs are covered as Damages under Insuring Agreement I.B or I.C.

As a condition precedent to coverage under this Additional Coverage A.3.:

(a)    The forensics firm selected by the **Named Insured** to perform data forensic services in connection with such **Data Breach** must be approved in writing by the **Insurer**, prior to the **Named Insured** incurring any **Data Forensic Expenses**;

(b)    The **Data Breach** shall be reported to the **Insurer**, as soon as practicable after it is discovered by the **Insured**, but in no event later than thirty (30) days after the termination of the **Policy Period**; and

(c)    **Data Forensic Expenses** must be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the **Named Insured** first incurs such **Data Forensic Expenses**.

B.    Non-Profit Director and Officer Coverage

The **Insurer** will reimburse an individual **Insured** lawyer, subject to the Limit of Liability set forth in Item 3.II.(b) of the Declarations and the applicable Retention, all amounts that such **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out of a **Non-Profit Director or Officer Wrongful Act** that is first made during the **Policy Period** or any Extended Reporting Period.

The coverage provided under this Additional Coverage B. is specifically excess of, and shall not contribute with, any other insurance plan or program of insurance or self-insurance carried by the **Non-Profit Organization**, or any contribution and indemnification to which the individual **Insured** lawyer is entitled to from such **Non-Profit Organization**.

The most the **Insurer** shall pay for all **Claims** for which coverage is provided under this Additional Coverage B. shall be an amount equal to the lesser of:

(a)    The per **Claim** Limit of Liability under the **Non-Profit Organization's** Directors and Officers Liability Insurance; or

(b)    The Limit of Liability set forth in Item 3.I.(a) of the Declarations;

up to a maximum amount of $500,000 per **Claim** and in the aggregate for all such **Claims**. Any payment made under this Additional Coverage B. shall be part of, and not in addition to, the applicable Limit of Liability set forth in Item 3.I. of the Declarations.

As a condition precedent to coverage under this Additional Coverage B.:

(a)  The individual **Insured** lawyer serving as a director, officer or committee member of the **Non-Profit Organization** must do so with the express consent or at the request of the **Named Insured**;

(b)  The **Non-Profit Organization** will have, in full force and effect during the **Policy Period** or any Extended Reporting Period, Directors and Officers Liability Insurance with Limits of Liability of at least $500,000 per claim and in the aggregate for all claims; and

(c)  No more than ten percent (10%) of the **Named Insured's** annual gross revenues are derived directly or indirectly from **Legal Services** performed by any **Insured** for the **Non-Profit Organization**.

C.  Lost Earnings Coverage

The **Insurer** shall reimburse each **Insured**, subject to the Limit of Liability set forth in Item 3.II.(c) of the Declarations, for personal earnings actually lost each day or part of a day such **Insured**, at the **Insurer's** express request, attends a hearing, deposition, mediation, settlement conference, arbitration or trial arising from a **Claim** first made during the **Policy Period** and reported to the **Insurer** in accordance with Section V.E. of the Policy. Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations and shall not be subject to any Retention.

This coverage shall not apply in the event of a **Disciplinary Proceeding**.

D.  Disciplinary Proceedings Coverage

The **Insurer** will pay on behalf of an **Insured** subject to the Limit of Liability set forth in Item 3.II.(d) of the Declarations, reasonable fees, costs and expenses incurred in responding to a **Disciplinary Proceeding** initiated against the **Insured** and reported to the **Insurer** during the **Policy Period** or any Extended Reporting Period. Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations and shall not be subject to any Retention.

E.  Subpoena Coverage

Subject to the Limit of Liability set forth in Item 3.II.(e) of the Declarations, if during the **Policy Period** an **Insured** receives a **Subpoena** arising out of the performance of or failure to perform **Legal Services**, the **Insured** may obtain the **Insurer's** assistance in responding to the **Subpoena** by providing the **Insurer** with a copy of the **Subpoena**. The **Insurer** shall retain an attorney to provide advice regarding the production of documents, to prepare the **Insured** for sworn testimony, and to represent the **Insured** at the **Insured's** deposition, provided that:

(a)     The **Subpoena** must be reported to the **Insurer** as soon as practicable, but in no event later than the termination of the **Policy Period**;

(b)     The **Subpoena** must arise out of a lawsuit to which the **Insured** is not a party; and

(c)     The **Insured** has not been engaged to provide advice or testimony in connection with the lawsuit, nor has the **Insured** provided such advice or testimony in the past.

Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations and shall not be subject to any Retention.

Any notice the **Insured** gives the **Insurer** of such **Subpoena** shall be deemed notification of a potential **Claim** under Section V.E.3. of this Policy.

## III.   DEFINITIONS

A.    **APPLICATION** means: (a) the application, including any competitor's application, submitted to the **Insurer**, or any affiliate thereof, for this Policy or any other policy; (b) any attachments and other materials provided with any such application or incorporated into any such application; and (c) any other materials and information submitted by the **Insured** to the **Insurer** in connection with the underwriting of this Policy.

B.    **BODILY INJURY** means injury to the body, sickness or disease sustained by any person, including death resulting from such injuries; including any mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person, whether or not resulting from injury to the body, sickness, disease or death of any person.

C.    **CLAIM** means:

1.     any written notice or demand for monetary relief or **Legal Services**;
2.     any civil proceeding in a court of law;
3.     any administrative proceeding, other than a **Disciplinary Proceeding**; or
4.     a request to toll or waive a statute of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for any **Wrongful Act**.

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim**.

D.   **CLAIM EXPENSES** means:

1.   reasonable fees, costs and expenses charged by attorneys retained or approved by the **Insurer** for a **Claim** brought against an **Insured**;

2.   reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the **Insurer** to apply for or furnish such bond.

Claim Expenses shall not include:

(a)   salaries, loss of earnings, reimbursement for the **Insured's** time or attendance required in any investigation or defense;

(b)   other remuneration by or to any **Insured**.

The determination by the **Insurer** as to the reasonableness of **Claim Expenses** shall be conclusive on all **Insureds**.

E.   **CONFIDENTIAL INFORMATION** means any confidential information of a client or third party which is obtained by the **Insured** for the purpose of providing **Legal Services**, including but not limited to:

1.   any information subject to the attorney-client privilege;

2.   information from which an individual may be uniquely and reliably identified, including, but not limited to an individual's name, address, telephone number, in combination with their social security number, account relationships, account numbers, passwords, PIN numbers, credit card numbers or biometric information;

3.   "nonpublic personal information" as defined by Title V of the Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) ("GLB"), as amended, and any regulations promulgated thereto;

4.   "protected health information" as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA"), or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111-5), as amended, and any regulations promulgated thereto;

5.   personal information as defined in the California Database Protection Act of 2003 (Cal. SB 1386) and California A.B. 1950, as amended, and any regulations promulgated thereto; or

6.   personal and confidential information as defined in any U.S. federal or state privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder, or any similar or related laws or regulations of any foreign jurisdiction.

F.   **CRISIS MANAGEMENT EXPENSES** means the following amounts when incurred during, or within ninety (90) days prior to, a **Material Event**:

1.   amounts for which the **Named Insured** becomes legally liable for those services performed by a public relations firm, crisis management firm or law firm selected by the **Named Insured** and approved in advance in writing by the **Insurer**, to minimize potential harm to the **Named Insured** arising from a **Material Event**, including, without limitation, maintaining and restoring public confidence in the **Named Insured**, and providing advice to the **Named Insured** or any of its directors, officers, partners or employees; and

2.   amounts for which the **Named Insured** becomes legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, partners, employees or the firm rendering services as referenced above.

**Crisis Management Expenses** shall not include compensation, fees, benefits, overhead, or the charges or expenses of any **Insured**.

G.   **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest.

**Damages** shall not include:

1.   criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

2.   punitive, exemplary or the multiplied portion of multiple damages;

3.   amounts deemed uninsurable by law;

4.   the return or restitution of legal fees, costs and expenses, no matter how claimed;

5.   amounts paid or incurred by an **Insured** to comply with a judgment or settlement for any form of equitable or non-monetary relief; or

6.   amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

H.   **DATA BREACH** means the unauthorized misappropriation or disclosure of **Confidential Information** that is in the physical possession of the **Insured** or which is stored on, transmitted or received by, the **Named Insured's Network**.

I.   **DATA FORENSIC EXPENSES** means the reasonable and necessary costs incurred by the **Named Insured** to retain a qualified forensics firm to investigate, examine and analyze the **Named Insured's Network**, to find the cause, source and extent of a **Data Breach**.

J.   **DIGITAL ASSETS** means software and electronic data that is stored on or within the **Named Insured's Network**. **Digital Assets** shall include the capacity of the **Named Insured's Network** to store and process data and information and electronically disseminate data and information over the Internet.

K.   **DISCIPLINARY PROCEEDING** means any proceeding initiated by a regulatory, disciplinary or licensing official, board or agency to investigate charges made against an **Insured** alleging professional misconduct in the performance of or failure to perform **Legal Services**.

L.   **IDENTITY THEFT** means the misappropriation of the **Confidential Information** that is in the **Insured's** care, custody and control, which has resulted in the wrongful or fraudulent use of such **Confidential Information**, including but not limited to, fraudulently emulating the identity of an individual or corporation.

M.   **IMMEDIATE FAMILY** means:

   1.   the **Insured**;
   2.   the **Insured's** lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or any formal program established by the **Named Insured**);
   3.   the **Insured's** parents, adoptive parents, or step-parents;
   4.   the **Insured's** siblings or step-siblings;
   5.   the **Insured's** children, adoptive children, or step-children.

N.   **INSURED** means:

   1.   the **Named Insured**;

   2.   any **Predecessor Firm**;

   3.   any lawyer or professional corporation listed in the **Application**, on the day the **Policy Period** incepts until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

   4.   any lawyer or professional corporation who becomes a partner, officer, director, stockholder or shareholder or employee of the **Named Insured** during the **Policy Period** until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

   5.   any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** or **Predecessor Firm**;

   6.   any person or entity who is designated by the **Named Insured** as counsel or of counsel in the **Application**, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

7.    any other person who is employed or retained by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** and also only within the scope of such employment or retention agreement; and

8.    the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

O.    **INSURER** means the company identified in the Declarations.

P.    **LEGAL SERVICES** means those services performed on behalf of the **Named Insured** for others by an **Insured**, whether or not performed for a fee or other consideration, as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, administrator, conservator, receiver, executor, guardian, trustee, fiduciary or escrow agent, but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer. **Legal Services** also include services rendered by an **Insured** as a: (a) member of a formal accreditation, ethics, peer review or licensing board, standards review board, bar association, or any similar board or committee; (b) expert witness in a legal malpractice proceeding; or (c) author, publisher or presenter of legal research or legal articles and papers, but only if the compensation received by the **Insured** annually from such services is less than $5,000. **Legal Services** do not include services rendered as a real estate agent or broker, as an insurance agent or broker or as a certified public accountant.

Q.    **LEGAL SERVICES WRONGFUL ACT** means:

1.    any actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**; or

2.    any actual or alleged **Personal Injury** committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**.

R.    **MALICIOUS CODE** means unauthorized and either corrupting or harmful software code, including but not limited to computer viruses, Trojan horses, worms, logic bombs, spyware or spider ware.

S.    **MATERIAL EVENT** means the publication, in media of widespread distribution, of unfavorable information relating to a **Data Breach** or the **Privacy and Network Security Wrongful Acts** of an **Insured**, which can be reasonably considered to lessen public confidence in the competence, integrity or viability of the **Named Insured** to conduct business.

T.    **NAMED INSURED** means the entity named in Item 1. of the Declarations.

U.  **NETWORK** means computer hardware, software, firmware, and components thereof, including **Digital Assets** stored thereon, which are connected through two or more computers, including such networks accessible through the Internet, intranets, extranets or virtual private networks. **Network** shall not include the computer hardware, software, firmware, or components thereof, of any third party provider of telephone, telecommunications, cable, Internet, or satellite services.

V.  **NETWORK SECURITY** means the use of hardware, software and firmware, including, without limitation, firewalls, filters, routers, intrusion detection software, antivirus software, automated password management applications and other authentication mechanisms, which are designed to control or restrict the access to a **Network**, or parts thereof.

W.  **NETWORK SECURITY WRONGFUL ACT** means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty committed by an **Insured**, solely in connection with the performance of or failure to perform **Legal Services**, which results in a breach of the **Insured's Network Security**, the consequences of which are:

  1.  the inability of a client or authorized third party to gain access to the **Insured's** website or **Network** in order to transmit or access documents or information;

  2.  **Identity Theft;**

  3.  the transmission of **Malicious Code;** or

  4.  the unauthorized release of a client or third party's confidential and proprietary business information which is obtained by the **Insured** for the purpose of providing **Legal Services**.

X.  **NON-PROFIT DIRECTOR OR OFFICER WRONGFUL ACT** means any actual or alleged act, error or omission committed by an individual **Insured** lawyer while serving in his or her capacity as a director, officer or committee member of a **Non-Profit Organization.**

Y.  **NON-PROFIT ORGANIZATION** means a corporation or organization, other than an **Insured** entity, which is exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as the same may be amended from time to time.

Z.  **PERSONAL INJURY** means libel, slander, violation of a right of privacy, false arrest, detention, imprisonment, wrongful entry, eviction, malicious prosecution or abuse of process, when insurable under the law pursuant to which this Policy shall be construed.

AA.  **POLICY PERIOD** means the period from the Inception Date shown in Item 2. of the Declarations to the earlier of the Expiration Date shown in Item 2. of the Declarations, or the effective date of cancellation of this Policy.

BB.  **PREDECESSOR FIRM** means any individual or entity engaged in **Legal Services** to whose financial assets and liabilities the **Named Insured** is the majority successor-in-interest.

CC. **PRIVACY WRONGFUL ACT** means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty committed by any **Insured**, solely in connection   with the performance of or failure to perform **Legal Services**, which results in:

    1. the misappropriation or disclosure of **Confidential Information**; or

    2. a breach or violation of U.S. federal or state law or regulations or any similar or related laws or regulations of any foreign jurisdiction associated with the of the actual or potential unauthorized access to or disclosure of **Confidential Information,** or any similar or related laws or regulations of any foreign jurisdiction.

Privacy Wrongful Act shall not include any breach or violation of any U.S. federal or state law or any similar or related laws or regulations of any foreign jurisdiction if such breach or violation is not the result of the actual or potential unauthorized disclosure of, or access to **Confidential Information.**

DD. **RELATED ACT OR OMISSION** means all acts or omissions based on, arising out of, directly or indirectly resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

EE. **RETROACTIVE DATE** means the applicable date specified in Item 7. of the Declarations.

FF. **SUBPOENA** means a written judicial order issued to any **Insured** to provide testimony or to produce or allow the inspection of documents, records, notes, electronic information, tape recordings, photographs, taped footage or other related materials.

GG. **TOTALLY AND PERMANENTLY DISABLED** means a medically determinable impairment of the mind or body which wholly prevents an **Insured** from providing **Legal Services**, when such impairment is reasonably certain to continue throughout the lifetime of the **Insured** or to result in death.

HH. **WRONGFUL ACT** means a **Legal Services Wrongful Act**, **Privacy Wrongful Act**, **Network Security Wrongful Act** or a **Non-Profit Director and Officer Wrongful Act**.

IV. **EXCLUSIONS**

A. This Policy does not cover any **Claim** or **Disciplinary Proceeding**:

    1. based upon, involving or contributed to by any dishonest, fraudulent, criminal, malicious, or intentional act or omission, or any willful violation of any statute, rule or law, by an **Insured**;

This Exclusion A.1. shall not apply unless such conduct has been established by an admission, final adjudication or finding in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**.

Whenever coverage under this Policy would be excluded, suspended or lost due to this Exclusion A.1., the **Insurer** agrees that such insurance as would otherwise be afforded under this Policy shall be applicable with respect to any **Insured** who did not acquiesce in or remain passive after having knowledge of such conduct.

2.  brought by or on behalf of, or in the name or right of, any **Insured**;

    provided, however, that this Exclusion A.2. shall not apply to any **Claim** which arises out of **Legal Services** rendered by one **Insured** to another where an attorney-client relationship exists between such **Insureds**.

3.  for any actual or alleged violation by an **Insured** of the Employment Retirement Income Security Act of 1974, its amendments, or any regulation or orders promulgated pursuant thereto, or of any similar provisions of federal, state or local law or regulation;

4.  alleging, arising out of, based upon or attributable to any actual or alleged act, error or omission of any natural person who is not an **Insured**, if such **Claim** or **Disciplinary Proceeding** is based upon office-sharing arrangements, theories of partnership by estoppel, apparent partnership, apparent agency, ostensible agency, vicarious liability, or any similar theory.

B.  This Policy does not cover any **Claim** or **Disciplinary Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:

    1.  any act whatsoever of an **Insured** in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate;

    2.  the **Insured's** capacity or status as:

        (a)  an officer, director, partner, trustee, shareholder, manager or employee of a: (i) business enterprise; (ii) charitable organization; (iii) pension fund or trust; (iv) welfare fund or trust; (v) profit sharing fund or trust; (vi) mutual fund or trust; or (vii) investment fund or trust;

             provided, however, that this Exclusion B.2.(a) shall not apply to an otherwise covered **Claim** for any **Non-Profit Director or Officer Wrongful Act**; or

        (b)  a public official, or an employee of a governmental body, subdivision, or agency unless the **Insured** is privately retained solely to render **Legal Services** to the governmental body, subdivision or agency and the remuneration for the **Legal Services** is paid directly or indirectly to the **Named Insured**.

    3.  any actual or alleged **Wrongful Acts** of an **Insured**, whether or not such **Legal Services** are performed with or without compensation, for any business enterprise, whether for profit or not-for-profit, in which any **Insured**, or a member of an **Insured's Immediate Family**, has a "Material Interest."

For purposes of this Exclusion B.3., a "Material Interest" shall mean the right of an **Insured** or a member of an **Insured's Immediate Family** directly or indirectly to:

(a)    own 10% or more of an interest in an entity;

(b)    vote 10% or more of the issued and outstanding voting stock in an incorporated entity;

(c)    elect 10% or more of the directors of an incorporated entity;

(d)    receive 10% or more of the profits of an unincorporated entity; or

(e)    act as general partner of a limited partnership, managing general partner of a general partnership, or comparable positions in any other business enterprise.

4.    the alleged rendering of investment advice, including advice given by any **Insured** to make any investment or to refrain from doing so;

5.    liability assumed by an **Insured** under an indemnity, hold harmless or liquidated damages provision or agreement, or similar provisions or agreements;

provided, however, that this Exclusion B.5. shall not apply if such liability would have attached to the **Insured** by law in the absence of such provision or agreement;

6.    the notarized certification or acknowledgement of signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

7.    **Bodily Injury**, and injury to, or destruction of, any tangible property, including the loss of use resulting therefrom;

provided however, that the exclusion of **Bodily Injury** does not apply to that portion of a **Claim** for mental injury, mental anguish, mental tension, or emotional distress caused by:

(a)    **Personal Injury**;

(b)    a **Non-Profit Director and Officer Wrongful Act**; or

(c)    a **Privacy Wrongful Act**

8.    the loss of value of any asset in the **Insured's** care, custody or control, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling of client funds.

C.    This Policy does not cover **Damages** from any **Claim** arising out of **Privacy Wrongful Acts** and **Network Security Wrongful Acts**, **Crisis Management Expenses** from a **Material Event**, notification and credit monitoring costs from a **Privacy Wrongful Act** or **Data Forensic Expenses** from a **Data Breach** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the following:

1.    unsolicited electronic dissemination of faxes, e-mails, text messages or similar communications to actual or prospective customers of the **Insured** or to any other third party, including but not limited to any violation of the Telephone Consumer Protection Act, any federal or state anti-spam statute, or

any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion;

2. failure, interruption or reduction in supply of utility service or infrastructure, including, without limitation, electrical, gas, water, telephone, Internet, cable, satellite, or telecommunications;

3. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power;

4. the return, reinvestment, reimbursement or replacement of funds, monies or securities or anything of monetary value that an **Insured** holds, receives or transfers, or fails to hold, receive or transfer, including any interest that accrued or failed to accrue;

5. any wireless network that is not protected by either Wi-Fi Protected Access ("WPA") or any other security protocol that provides equal or greater protection than WPA;

6. the use of a laptop computer, portable computer or other portable electronic device which does not employ whole disc encryption;

7. back -up tapes, optical media, or any other form of portable back-up media which are not encrypted;

8. expiration or withdrawal of technical support by a software vendor;

9. any actual or alleged violation of any law or statute protecting any patent, or any rule or regulation promulgated thereunder or of any provision of the common law imposing liability in connection therewith, or the misappropriation, misuse or disclosure of confidential and proprietary business information or trade secrets, other than a **Network Security Wrongful Act** as specifically described in Definition W., part 4.

## V.   CONDITIONS

### A.   LIMIT OF LIABILITY

Regardless of the number of **Claims**, claimants, **Material Events**, **Privacy Wrongful Acts**, **Data Breaches** or other matters giving rise to coverage under this Policy, or the number of persons or entities included within the definition of **Insured**, the **Insurer's** liability is limited as follows:

1. Limit of Liability for Insuring Agreements

   (a) The Limit of Liability set forth in Item 3.I.(a) of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. for all **Damages** and **Claim Expenses** resulting from each **Claim** for **Legal Services Wrongful Acts**, **Privacy Wrongful Acts** and **Network Security Wrongful Acts**.

(b)     The Aggregate Limit of Liability for Insuring Agreement I. of this Policy, as set forth in Item 3.I.(b) of the Declarations, is the **Insurer's** maximum liability for all **Damages** and **Claim Expenses** resulting from all **Claims** for **Legal Services Wrongful Acts, Privacy Wrongful Acts** and **Network Security Wrongful Acts.**

2.     Limits of Liability for Additional Coverages

(a)     The Shared Aggregate Limit of Liability, as set forth in Item 3.II.(a) of the Declarations, is the **Insurer's** maximum liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage..

(b)     The Limits of Liability, as set forth in Item 3.II.(b) of the Declarations is the **Insurer's** maximum liability for all **Damages** and **Claim Expenses** resulting from each and every **Claim** and all **Claims** for **Non-Profit Director or Officer Wrongful Acts.**

(c)     The Limits of Liability, as set forth in Items 3.II.(c) – 3.II.(e) of the Declarations, is the **Insurer's** maximum liability for Additional Coverages C, D and E.  Any amounts paid under these Additional Coverages are in addition to the Policy Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations.

3.     Policy Aggregate Limit of Liability

The Policy Aggregate Limit of Liability for this Policy, as set forth in Item 3.III.(a) of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. and Section II., Additional Coverages A and B.

4.     Claim Expenses

**Claim Expenses** are part of and not in addition to the Limit of Liability and shall reduce and may exhaust the Limit of Liability.  The Limit of Liability shall first be applied to **Claim Expenses** with the remainder, if any, being the amount available to pay as **Damages**.

5.     Exhaustion of Limit of Liability

The **Insurer** shall not be obligated to pay any **Damages, Claim Expenses** or any other amounts payable under this Policy or to defend or continue to defend any **Claim** after the Limit of Liability set forth in Item 3.III.(a) has been exhausted. In such case, the **Insurer** shall have the right to withdraw from the further investigation or defense of any pending **Claim** by tendering control of such investigation or defense to the **Named Insured** and the **Named Insured** agrees, as a condition to the issuance of this Policy, to accept such tender and proceed solely at its own cost and expense.

B.     **RETENTION**

1.     With respect to the coverage provided under Insuring Agreement I., the **Insurer's** obligation to pay **Damages**, including **Claim Expenses**, is in excess of the Retention set forth in Item 4.(a) of the Declarations, which Retention shall apply to each and every **Claim**.

2.     With respect to the coverage provided under Section II. Additional Coverage A., the **Insurer's** obligation to pay any amounts payable is in excess of the Retention set forth in Item 4.(b) of the Declarations, which Retention shall apply to each and every event giving rise to coverage under this Section II.A.

3.     With respect to the coverage provided under Section II. Additional Coverage B., the **Insurer's** obligation to pay **Damages**, including **Claim Expenses**, is in excess of the Retention set forth in Item 4.(c) of the Declarations, which Retention shall apply to each and every **Claim**.

4.     A Retention shall only apply to an Additional Coverage where so indicated on the Declarations.

5.     It is the **Named Insured's** responsibility to pay **Damages**, **Claim Expenses** or any other amounts payable under this Policy up to the amount of the Retention.  The **Insurer** shall only be liable to pay, subject to the Limit of Liability provisions stated in this Section, for **Damages**, **Claim Expenses** or any other amounts payable under this Policy in excess of such Retention and such Retention shall not be insured under this Policy.

6.     Solely at the option of the **Insurer**, the **Insurer** may advance all or some portion of the Retention amount in the event that the **Named Insured** fails to do so in a timely manner.  In such event, the **Named Insured** shall pay back the Retention to the **Insurer** no later than fifteen (15) days after demand by the **Insurer**.

C.     **DEFENSE AND SETTLEMENT OF CLAIMS**

1.     The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy.  The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**.

2.     The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into a settlement of any **Claim** that the **Insurer** deems appropriate.

If, however, the **Insured** refuses to consent to any settlement recommended by the **Insurer** and acceptable to the claimant, then subject to the Limit of Liability set forth in Item 3.I.(a) of the Declarations, the **Insurer's** liability for **Damages** and **Claim Expenses** relating to that **Claim** shall not exceed:

(a)     the amount for which the **Claim** could have been settled by the **Insurer**, plus all **Claim Expenses** incurred up to the date the **Insured** refused to settle such **Claim**; plus

       (b)      fifty (50) percent of any **Damages** and/or **Claim Expenses** in excess of the amount in clause a. above, incurred in connection with such **Claim**. The remaining **Damages** and/or **Claim Expenses** will be carried by the **Insured** at its own risk and will be uninsured.

3.     The **Insurer** shall not be obligated to pay any **Damages** or **Claim Expenses**, or to defend or continue to defend any **Claim** after the applicable Limit of Liability has been exhausted. If the **Insurer's** Policy Aggregate Limit of Liability as set forth in Item 3.III.(a) of the Declarations is exhausted by the payment of **Damages** and **Claim Expenses**, the entire premium will be deemed fully earned.

4.     The **Insurer**, at its sole discretion, shall have the right and option to retain counsel to investigate and defend any potential **Claim** and to pay for costs or expenses incurred as a result of any such investigation or defense. Any payment of these costs or expenses shall be part of, and not in addition to, the Limit of Liability set forth in Item 3. of the Declarations and subject to the Retention set forth in Item 4. of the Declarations.

5.     If the **Named Insured** has not paid any premiums due or satisfied any applicable Retentions, the **Insurer** has the right, but not the obligation, to settle any **Claims** without the consent of the **Insured**.

D.    **MULTIPLE POLICIES**

If this Policy and any other policy issued by the **Insurer** including any Extended Reporting Period coverage afforded by such policy or policies, provides coverage for the same **Claim** against the **Insured**, the maximum limit of liability under all the policies shall not exceed the highest remaining per **Claim** limit of liability under any one policy.

E.    **NOTICE OF CLAIMS AND CIRCUMSTANCES**

1.     **NOTICE ADDRESS**

Notice of any actual or potential **Claim** shall be made to the **Insurer** at noticeofloss@awac.com. All other notices shall be made to the **Insurer** at the address shown in Item 5. of the Declarations.

2.     **NOTICE OF AN ACTUAL CLAIM**

       (a)     The **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, of a **Claim** made against an **Insured** during the **Policy Period**, as soon as practicable, but in no event later than sixty (60) days after the termination of the **Policy Period**.

       (b)     The **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, of a **Claim** made against an **Insured** during any Extended Reporting Period, as soon as practicable, but in no event later than the termination of the Extended Reporting Period.

(c)     In the event suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Insurer** every demand, notice, summons or other process received directly or by an **Insured's** representative.

3.     **NOTICE OF A POTENTIAL CLAIM**

If, during the **Policy Period**, the **Insured** first becomes aware of a **Wrongful Act** which may reasonably be expected to be the basis of a **Claim** against an **Insured**, and the **Insured**, as soon as practicable, but in no event later than the termination of the **Policy Period**, gives the **Insurer** written notice of the **Wrongful Act** including a description of the **Wrongful Act**, allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then the **Insurer** will treat any subsequently resulting **Claim** as if it had first been made during the **Policy Period**.

4.     **FRAUDULENT CLAIM**

If any **Insured** shall commit fraud in proffering any **Claim** with regard to amount or otherwise, this Policy shall become void from the inception as to such **Insured**.

5.     **RELATED CLAIMS**

All **Claims** based upon or arising out of the same **Wrongful Act** or **Related Act or Omission** shall be considered a single **Claim** and shall be considered first made at the time the earliest **Claim** arising out of such **Related Act or Omission** was first made. In any such event, only one Limit of Liability and one Retention shall apply.

F.     **EXTENDED REPORTING PERIOD OPTIONS**

1.     **AUTOMATIC EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, and if this Policy has been in force for at least six (6) months, or if it has been in force for fewer than six (6) months and the **Insurer** consents, the **Named Insured** shall have the right to a period of sixty (60) days immediately following the effective date of such cancellation or non-renewal, in which to give notice to the **Insurer** of **Claims** first made against the **Insured** during such sixty (60) day period for any **Wrongful Acts** committed prior to the effective date of such cancellation or non-renewal and otherwise covered by this Policy.

2.     **OPTIONAL EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, the **Named Insured** has the right upon notification to the **Insurer** of its intent to purchase an Optional Extended Reporting Period Endorsement, and payment to the **Insurer** of an additional premium as set forth below within sixty (60) days of the cancellation or non-renewal, to extend the period for reporting **Claims** first made against an **Insured** after the termination of the **Policy Period** for any **Wrongful Acts** committed prior to the termination

of the **Policy Period** and otherwise covered by this Policy. For purposes of determining the availability of an Extended Reporting Period Endorsement, any change in the premium or terms on renewal shall not constitute a refusal to renew.

The **Named Insured** may select from the following Optional Extended Reporting Period options:

(a)   a one-year Optional Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6. of the Declarations;

(b)   a two-year Optional Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6. of the Declarations;

(c)   a three-year Optional Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6. of the Declarations;

(d)   a five-year Optional Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6. of the Declarations;

(e)   an unlimited Optional Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6. of the Declarations.

3.   **NON-PRACTICING EXTENDED REPORTING PERIOD**

If an individual **Insured** lawyer, other than a contract attorney, which is listed on the **Application** for this Policy and insured hereunder as of the Inception Date of this Policy, retires or otherwise ceases the private practice of law in all jurisdictions during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to purchase a Non-Practicing Extended Reporting Period Endorsement. Unless the **Insured** qualifies for a waiver of premium under Paragraph F.4. below, such **Insured** must make payment to the **Insurer** of an additional premium as set forth below prior to the termination of the **Policy Period**. The Non-Practicing Extended Reporting Period will extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the private practice of law and otherwise covered by this Policy. If an individual **Insured** lawyer shall resume the practice of law at any time, for any reason, in any jurisdiction, the Non-Practicing Extended Reporting Period elected by such **Insured** shall no longer be effective.

Coverage for any **Claim** first made during a Non-Practicing Extended Reporting Period shall be excess over and shall not contribute with any other insurance in effect on or after the effective date of the Non-Practicing Extended Reporting Period, which covers the **Insured** for such **Claim**.

The additional premium for a Non-Practicing Extended Reported Period shall be calculated using the per individual **Insured** lawyer rate in effect upon the Inception Date of this Policy, based on the number of lawyers with the **Named Insured** at the Inception Date of this Policy, as stated on the **Application** or most recent Renewal Application, multiplied by the percentage set forth below which corresponds to the number of years elected for the Non-Practicing Extended Reporting Period.

The **Insured** may select from the following Non-Practicing Extended Reporting Period options:

(a)   a one-year Non-Practicing Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6. of the Declarations;

(b)   a two-year Non-Practicing Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6. of the Declarations;

(c)   a three-year Non-Practicing Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6. of the Declarations;

(d)   a five-year Non-Practicing Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6. of the Declarations;

(e)   an unlimited Non-Practicing Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6. of the Declarations.

4.   **WAIVER OF PREMIUM FOR NON-PRACTICING EXTENDED REPORTING PERIOD**

(a)   Waiver Upon Death

If an individual **Insured** lawyer, as described in Section V.F.3. above, dies during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium, until the executor or administrator of the estate of such individual **Insured** lawyer is discharged, provided always that the death did not result from an intentionally self-inflicted injury, suicide or alcohol or drug abuse. Written notification and written proof of death of the **Insured** must be provided prior to the termination of the **Policy Period**. Such Non- Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of death and otherwise covered by this Policy.

(b)   Waiver Upon Disability

If an individual **Insured** lawyer, as described in Section V.F.3. above, becomes **Totally and Permanently Disabled** during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended

Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium. It shall be a condition precedent to the Non-Practicing Extended Reporting Period that: (1) the disability did not result from intentionally self-inflicted injuries, or from attempted suicide, or from alcohol abuse or from drug abuse; (2) the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years; (3) the **Insured** or his or her legal guardian provides written notice of the disability to the **Insurer** prior to the termination of the **Policy Period**; and (4) the **Insured** or the **Insured's** legal guardian provides a physician's written certification of the disability, including the date it began. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the date the **Insured** is deemed **Totally and Permanently Disabled** and otherwise covered by this Policy.

(c)     Waiver For Continuous Coverage

If an individual **Insured** lawyer, as described in Section V.F.3. above, retires or otherwise ceases the private practice of law during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to elect an unlimited Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium. A condition precedent to the Non-Practicing Extended Reporting Period shall be that the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years. The **Insured** must provide written notice of his or her request to elect the Non-Practicing Extended Reporting Period prior to the termination of the **Policy Period**. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the private practice of law and otherwise covered by this Policy.

5.     **CONDITIONS APPLICABLE TO ALL EXTENDED REPORTING PERIOD OPTIONS**

(a)     The right to any of the Extended Reporting Period Endorsement options is not available to any **Insured** if:

(i)     cancellation or nonrenewal by the **Insurer** is due to either: nonpayment of premium, Retention or other money due to the **Insurer**; or misrepresentation in the **Application**; or the failure to comply with the terms and conditions of this Policy; or

(ii)     the **Insured's** right or license to practice law is suspended, surrendered or revoked.

(b) The Limit of Liability available for any Extended Reporting Period is part of, and not in addition to, the Limit of Liability shown in Item 3. of the Declarations of the Policy.

(c) The Retention, as shown on the Declarations, which is applicable to Claims first made during any Extended Reporting Period, will apply separately to each and every Claim. The Retention will be waived for Claims first made during a Non-Practicing Extended Reporting Period in the event that an individual Insured lawyer qualifies for a Non-Practicing Extended Reporting Period based on: (i) the death of the Insured, or (ii) becoming Totally and Permanently Disabled.

(d) None of the Extended Reporting Period options are cancelable or renewable. Any additional premium, if applicable, for the Extended Reporting Period Endorsement is fully earned at the inception of the Extended Reporting Period.

## G. POLICY TERRITORY

The coverage afforded by this Policy applies to any Wrongful Acts that occur anywhere in the world, and Claims brought anywhere in the world.

## H. ASSISTANCE AND COOPERATION OF THE INSURED

All Insureds shall cooperate with the Insurer, including providing all information requested by the Insurer regarding any Claim, and cooperating fully with the Insurer in the defense, investigation and settlement of any Claim. Upon the Insurer's request, all Insureds shall submit to examination by a representative of the Insurer, under oath if required. In addition, upon the Insurer's request, all Insureds shall attend hearings, depositions, mediations, settlement conferences, arbitrations and trials, and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, all without charge to the Insurer.

The Insured shall follow the Insurer's direction regarding whether to accept or reject a demand for arbitration of any Claim and shall not voluntarily agree to arbitrate a Claim without the Insurer's written consent. No Insured shall, except at the Insured's own cost, make any payment, make any admission, admit liability, waive any rights, settle any Claim, assume any obligation or incur any expense without the prior written consent of the Insurer.

## I. SUBROGATION

The Insurer shall be subrogated to all Insureds' rights of recovery against any person or organization. All Insureds shall assist the Insurer in effecting any rights of indemnity, contribution and apportionment available to any Insured, including the execution of such documents as are necessary to enable the Insurer to pursue claims in the Insureds' names and shall provide all other assistance and cooperation which the Insurer may reasonably require. All Insureds shall cooperate with the Insurer and do nothing to jeopardize, prejudice or terminate in any way such rights.

The Insurer shall not exercise any such rights against any Insured except as provided herein. Notwithstanding the foregoing, however, the Insurer reserves the right to

exercise any rights of subrogation against any **Insured** with respect to any **Claim** brought about or contributed to by the dishonest, fraudulent, criminal, malicious, or intentional act or omission, or any willful violation of any statute of such **Insured**.

J. **CANCELLATION; NO OBLIGATION TO RENEW**

1. This Policy shall terminate upon the Expiration Date set forth in Item 2. of the Declarations, or upon any earlier cancellation.

2. This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect. If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

3. This Policy may be canceled by the **Insurer** by written notice mailed to the **Named Insured** at its last known address at least sixty (60) days before the effective date of such cancellation, if for reasons other than nonpayment of premium. The **Insurer** may cancel this Policy for nonpayment of premium by written notice mailed to the **Named Insured** at its last known address at least ten (10) days before the effective date of such cancellation. The notice will state the reason for and the effective date of the cancellation. If the Policy is canceled by the **Insurer**, the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis.

4. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

5. The **Insurer** will not be required to renew this Policy upon its expiration. If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail written notice, to the **Named Insured** at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2. of the Declarations. Such notice shall state the specific reason(s) for non-renewal.

K. **CHANGE IN RISK**

1. If, during the **Policy Period**, any of the following events occur:

   (a) the merger into or acquisition of the **Named Insured** by another entity such that the **Named Insured** is not the surviving entity, or the acquisition of substantially all of the assets of the **Named Insured**;

   (b) the dissolution of, or appointment of a receiver, conservator, trustee, liquidator or rehabilitator or similar official for the **Named Insured**;

   the **Named Insured** shall report the event to the **Insurer** within thirty (30) days of such event occurring.

   Coverage under this Policy will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed on or after such event.

After any such event, this Policy may not be canceled by the **Insured** and the entire premium for this Policy will be deemed fully earned.

2.  If, during the **Policy Period**, the number of lawyers or professional corporations performing **Legal Services** on behalf of the **Named Insured** increases by 50% or more, the **Named Insured** shall notify the **Insurer** in writing within thirty (30) days. The **Insurer** shall have the right to modify the terms and conditions of the Policy, including premium, as it determines in its sole discretion is appropriate.

L.   **OTHER INSURANCE**

The insurance provided by this Policy shall apply only as excess over any other valid and collectible insurance, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this Policy. This Policy shall not be subject to the terms and conditions of any other insurance policy.

M.   **ASSIGNMENT**

Neither this Policy nor any **Insured's** interest under this Policy may be assigned.

N.   **LEGAL ACTION AGAINST THE INSURER**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy and the amount of all the **Insured's** obligations to pay have been fully and finally determined either by judgment against all **Insureds** after actual trial, or by written agreement of the **Named Insured**, the claimant and the **Insurer**.

Nothing contained in this Policy shall give any person or organization any right to join the **Insurer** as a defendant in the action against any **Insured**.

O.   **APPLICATION**

By acceptance of this Policy, all **Insureds** affirm or reaffirm as of the Inception Date of this Policy that:

1.  the statements in the **Application** are true and accurate and are specifically incorporated herein, and are all **Insureds'** agreements, personal representations and warranties;

2.  all such communicated information shall be deemed material to the **Insurer's** issuance of this Policy;

3.  this Policy is issued in reliance upon the truth and accuracy of such representations;

4.  this Policy embodies all agreements existing between the **Insureds** and the **Insurer**, or any of its agents, relating to this insurance; and

5.  if any representation is false or misleading, this Policy shall be void from the inception.

P.   **CHANGES**

No change or modification of this Policy shall be effective except when made by a written endorsement to this Policy signed by an authorized representative of the **Insurer**. No representations by any person shall have any force or effect except as included in such endorsement.

Q.   **WAIVER**

The **Insurer's** failure to insist on strict compliance with any terms, provisions or conditions to coverage of this Policy or the failure to exercise any right or privilege shall not operate or be construed as a waiver thereof or of any subsequent breach thereof or a waiver of any other terms, provisions, conditions, privileges or rights.

R.   **ENTIRE AGREEMENT**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** or any of its agents relating to this insurance.

S.   **HEADINGS**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form not part of the terms and conditions of coverage.

# EXHIBIT B

# ROPER & THYNE, LLC

*Attorneys At Law*

77 Jefferson Place

Totowa, New Jersey 07512-2614

Telephone:   (973) 790-4441

Facsimile:   (973) 790-1016

Angela M. Roper, Esquire

Kenneth S. Thyne, Esquire

Angela.roper@njlegalmalpractice.com

Ken.thyne@njlegalmalpractice.com

March 18, 2016

VIA CERTIFIED RRR 7015 0640 0001 4639 8507

AND FIRST CLASS MAIL

Bruce H. Nagel, Esquire

Nagel Rice, LLP

103 Eisenhower Parkway

Roseland, New Jersey 07068

RE:   John Boulton, Individually and on Behalf of St. Louis, L.L.C.

Dear Mr. Nagel:

Please be advised this office has been retained by the above-named parties and have instituted a legal malpractice case on their behalf against you for your former representation of their interests. Enclosed is an authorization for review of your entire file including, but not limited to, attorney's notes, intra-office memoranda, billing records, and research.  Kindly telephone my office to advise when the file will be available for my review.  Please deem this letter a request pursuant to N.J.S.A. 2A:53A-28.

In the interim please place your malpractice insurance carrier on notice of this claim.

Very truly yours,

Angela M. Roper

AMR/mk

Enclosure

cc:   Edward Grossi, Esq., via Email

James Boulton, via Email

# EXHIBIT C

**Filing Attorney:**
Edward Grossi, Esq. – 03156-2009
7 North Mountain Ave.
Montclair, NJ 07042
Co-counsel for Plaintiffs

ROPER & THYNE, LLC
Angela Roper, Esq
77 Jefferson Place, Totowa, NJ 07512
973-790-4441
Co-counsel for Plaintiffs

| | |
|---|---|
| St. Louis, LLC; John Boulton,<br><br>Plaintiff(s)<br><br>v.<br><br>**Nagel Rice, LLC, Bruce H. Nagel, Esq., Elliott L. Pell, Esq., Greenbaum Rowe Smith & Davis, LLP, Dennis Estis, Esq., Eckert Siemans, Attorneys at Law, Michael Spero, Neil Day, Esq., John Does 1-10, a fictitious name,**<br><br>Defendant(s) | Superior Court of New Jersey<br>Somerset County; Law Division<br><br>Docket No. *L-389-16*<br><br>Civil Action<br><br>Complaint |

RECEIVED/FILED
SUPERIOR COURT

MAR 1 7 2016

SOMERSET COUNTY
DEPUTY CLERK

Plaintiff, with an address of 8 Farm Hollow Road, New Windsor, NY, County of , by way of Complaint against the Defendant(s), states as follows:

**Venue**

1.   Veune in this County is proper as Defendant Elliott L. Pell is a resident of Somerset County, residing at 378 Valley Road, Watchung, NJ, the Defendant Attorneys do business in Somerset County, and the underlying cause of action accrued in Somerset County.

**Facts**

2.   Plaintiff(s) incorporate each paragraph above as if repeated fully below.

3.   This legal-malpractice action arises from an underlying legal-malpractice action against Mackevich Burke & Stanicki and James Mackevich ("Mackevich Malpractice Litigation").

1

4.   The Mackevich Malpractice Litigation arose from three separate lawsuits that were filed and pursued on behalf of Plaintiff St. Louis LLC by James Mackevich, Esq. and the firm of Mackevich, Burke & Stanicki.

5.   Mackevich had originally been retained to pursue litigation against various contractors who performed work for Plaintiff St. Louis, LLC in the construction of a commercial building built to the BOCA code, located at 1315 Canal Road, Franklin Township, New Jersey ("Project"). This was part of a larger development project in which Plaintiffs had purchased a 48-acre junkyard/farm, where over a period of four years Plaintiffs remediated the property through cleaning numerous environmental hazards, and also obtained various municipal development approvals before construction on the Project ultimately began.

6.   The cost to develop and construct the Project was approximately $9 million, and the Project was listed by the Douglas Elliman Agency at one point for $18 million.

7.   Plaintiffs' intentions in constructing the Project were to use it both as a residence and as offices for the work of the Boultons' 501(c)(3) charitable foundation, the Alliance for Social Change.

8.   The Project did not come to fruition because numerous problems and defects in construction plagued the Project, resulting in three lawsuits against three separate companies, all of which were handled by James Mackevich and his firm:

     a.   St. Louis, LLC vs. Anthony & Sylvan Pools Corp., SOM-L-97-01

     b.   St. Louis, LLC vs. Final Touch, SOM-1553-01; and

     c.   St. Louis, LLC vs. Bomanite of New Jersey, SOM-L-1418-03

9.   The construction defects destroyed the project, resulting in Plaintiff St. Louis LLC having to sell the property for $3.5 million, representing a substantial loss when taking into account both the costs of construction as well as the previous listing price of the Property.

10.  While achieving some success in the first litigation, St. Louis recovered only a small portion of its damages in the Final Touch litigation, and then obtained no recovery and in fact incurred a net loss in the Bomanite litigation after having to pay defense costs and fees there, in addition to the fees paid to Mackevich.

11.  Following the negligent representations by Mackevich, Boulton retained Defendant Bruce Nagel and the Defendant firm of Nagel Rice, LLP to file a legal-malpractice action against Mackevich and his firm for their negligent handling of all three litigations (Anthony, Final Touch, and Bomanite).

12.  At the time of this representation, Defendant Elliott Pell was an employee of Nagel Rice, and Pell served as Boulton's primary contact at Nagel Rice in relation to the Mackevich Malpractice Lawsuit.

13.  It was Boulton's understanding that Nagel Rice would be pursuing allegations of legal-malpractice against Mackevich for all three actions, including the Bomanite litigation.

2

14. To that end, Boulton had provided Defendant Bruce Nagel with a memo detailing Mackevich's deficient handling of all three litigations, including the Bomanite litigation.

15. At or around the time they filed the malpractice Complaint against Mackevich, Bruce Nagel and the firm of Nagel Rice had received the files related to all three underlying litigations, including the Bomanite litigation.

16. Bruce Nagel did ultimately file a Complaint against Mackevich for his negligent handling of the three litigations, including the Bomanite Litigation.

17. In connection with the malpractice litigation, Nagel retained Defendant Dennis Estis of the Defendant firm of Greenbaum, Rowe, Smith & Davis, LLP to serve as an expert witness and provide an Affidavit of Merit in connection with the legal-malpractice litigation.

18. In connection with the malpractice litigation, an Affidavit of Merit signed by Dennis Estis was prepared under Nagel Rice's caption.

19. In this Affidavit, Estis specifically listed only two out of the three underlying actions as constituting the basis for St. Louis's claims for legal-malpractice against Mackevich. This list failed to include Mackevich's representation of St. Louis in the Bomanite action as part of the claims for legal-malpractice. (A copy of Estis's Affidavit of Merit is attached to this Complaint as Exhibit A and incorporated herein by reference.)

20. Nagel Rice did not notice or correct this error, and submitted the erroneous Affidavit of Merit.

21. Following March 18, 2010, the deadline by which an Affidavit of Merit had to be provided, Mackevich's counsel filed a motion to dismiss any portion of the malpractice complaint against Mackevich that related to his handling of the Bomanite litigation. Mackevich's Motion to Dismiss was not filed until May 24, 2010, and was granted on September 16, 2010.

22. The basis for Mackevich's Motion to Dismiss was Estis's and Nagel Rice's failure to specifically list the Bomanite litigation as a basis for the claims of malpractice against Mackevich in the Affidavit of Merit.

23. The negligent actions of Mackevich that were evident from review of the file that supported claims of malpractice in the Bomanite litigation were, among other deviations:

    a. Mackevich failed to obtain the necessary expert testimony to support the claim for damages against Bomanite;

    b. Mackevich failed to obtain the necessary expert testimony to establish the defective manner in which Bomanite installed cement flooring;

    c. Makevich failed to plead or include consumer-fraud allegations against Bomanite;

    d. Failing to make any post-trial motions or take any appeals of the Bomanite verdict;

    e. Allowing $100,000 in costs to be awarded to Bomanite in that litigation.

24. None of this negligent conduct in the Bomanite litigation (among other negligent conduct as revealed in the underlying file) and the damages flowing therefrom were considered as part of the claims against Mackevich in the underlying Mackevich Malpractice Litigation.

25. Nagel Rice was still counsel of record for St. Louis at the time the deadline to serve an Affidavit of Merit had passed.

26. Nagel Rice was also counsel of record at the time that Mackevich filed the Motion to Dismiss.

27. Before and around this time, Boulton had been consulting with Michael Spero regarding potential replacement counsel for Nagel Rice, as Boulton was unhappy with the response he was getting from Nagel Rice in their handling of his case.

28. Boulton contacted Defendant Michael Spero of the Defendant firm Eckert Seamans to assist in this search.

29. Spero provided Boulton with a list of referrals, and Spero and Boulton also conferred with other attorneys whom Boulton had contacted as potential successor counsel to Nagel Rice.

30. Some of these firms offered to provide representation on a contingent-fee basis to handle the Mackevich litigation, as had Nagel Rice.

31. Ultimately, Spero convinced Boulton that he should hire him and the Defendant firm of Eckert Seamans to succeed Nagel Rice, and that Boulton should pay his firm hourly fees based on the representation that his case had a high likelihood of winning and that he would recover all fees paid in the case as part of his damages.

32. Spero induced Plaintiffs to agree to the hourly representation based on a 50% fee reduction, and represented that he would only seek payment for half the amount that was invoiced, and the rest would be recovered at the close of the litigation if it was successful.

33. Spero then appeared as counsel in the malpractice litigation to contest the Motion to Dismiss the portions of the Complaint against Mackevich relating to the Bomanite litigation.

34. Spero opposed that motion by filing a cross motion seeking to dismiss those portions of the Complaint relating to the Bomante litigation without prejudice.

35. This course of action was unsuccessful, and Mackevich's Motion to Dismiss was granted, thereby eliminating any ability for Plaintiffs to recover for the damages caused by Mackevich's negligence in the handling of the Bomanite litigation.

36. Spero continued with the representation of St. Louis in the Mackevich Malpractice Litigation, while Plaintiff John Boulton paid all fees and expenses to Spero and Eckert Seamans and other experts in connection with the Mackevich Malpractice Litigation.

37. For a time, Defendant Neil Day was employed by Eckert Seamans and worked on Plaintiffs' file under the supervision of Defendant Spero and the firm of Eckert Seamans.

4

38. Spero proceeded with the representation through trial.

39. During discovery and throughout the case, Spero failed to perform the necessary investigation, obtain the relevant fact and expert testimony, and otherwise failed to detect and uncover and present through the appropriate expert testimony conduct of Mackevich that constituted negligence in connection with the underlying representations.

40. Certain omissions and negligent conduct on the part of Mackevich was never presented at trial by Spero to support St. Louis's malpractice claims, and the requisite expert testimony based on these facts was also never developed and presented.

41. Just prior to trial, Spero advised Boulton that he should waive his right to a jury trial and should proceed to have the Mackevich litigation tried as a bench trial.

42. The trial brief and pretrial exchange that Spero presented to the Court in connection with the Mackevich trial was submitted as if the case would be tried to a jury.

43. The case was tried before Judge Healy, who found in favor of Defendant Mackevich.

44. His written decision makes clear that significant breaches of the standard of care were never presented to the court for consideration in resolving St. Louis's claims for legal malpractice against Mackevich.

45. Spero made no post-trial motions, and advised Boulton that there were no grounds to appeal.

46. Plaintiffs paid Eckert Seamans and other experts associated with the case in excess of $700,000 in fees and expenses for handling the Mackevich Malpractice Litigation.

## First Count
### (Legal Malpractice as to Nagel Rice, LLC, Bruce Nagel, Esq., and Elliott Pell, Esq. (collectively, "Nagel Rice Defendants"))

47. Plaintiff(s) incorporate each paragraph above as if repeated fully below.

48. At all times relevant herein, the Nagel Rice Defendants were attorneys-at-law of the State of New Jersey, having been licensed to practice law in the State of New Jersey, or a firm organized to practice law in the State of New Jersey.

49. At all times relevant herein, the Nagel Rice Defendants, held themselves out as being particularly skilled, experienced, and expert in litigating legal-malpractice claims.

50. Upon assuming representation of Plaintiff(s), the Nagel Rice Defendants undertook and agreed to represent Plaintiff(s) with either the implicit or explicit representation and understanding that they possessed and would exercise due care and would provide adequate and competent representation to Plaintiff(s).

5

51. Defendant had a duty to represent Plaintiff(s) with that degree of skill and care possessed by the ordinary member of the legal profession.

52. The Nagel Rice Defendants, did in their representation of Plaintiff(s) fail to meet this duty, breached the applicable standard of care, and were negligent in failing to, among other things, obtain the appropriate Affidavit of Merit addressing the Bromanite claims, properly defend against the Motion to Dismiss the portion of Plaintiffs' Complaint as it related to the Bromanite claims, and did otherwise fail to conform to the standards of competence and reasonable skill in the legal profession that they represented themselves as having and did fail to provide adequate and competent representation to the Plaintiff(s) as detailed throughout this Complaint and incorporated herein.

53. As a direct and proximate result of the professional negligence and/or malpractice of the Nagel Rice Defendants, as referenced above, the Plaintiff suffered damages.

54. The Nagel Rice Defendants did neglect and/or mismanage the claim of the Plaintiff(s) and are responsible to them under *N.J.S.A.* 2A:13-4.

WHEREFORE, Plaintiff s demand judgment against Defendants Nagel Rice, LLP, Bruce H. Nagel, Esq., Elliott L. Pell, Esq., and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Second Count
### (Respondeat Superior as to Defendant Nagel Rice, LLP)

55. Plaintiff(s) incorporate each paragraph above as if repeated fully below.

56. The negligence and improper actions or inactions of Defendants Bruce Nagel, Esq. and Elliott L. Pell, as aforesaid, were made during the course of employment or within the scope of employment with the Defendant law firm of Defendant Nagel Rice, LLP, and said Defendant firm is liable for the negligent and/or improper actions or inactions Defendants Nagel, Pell, and any of its as yet unidentified employees (John Does 1-10) under principles of *respondeat superior* or applicable principles of agency or applicable principles of partnership law, corporate law, or otherwise.

WHEREFORE, Plaintiff(s) demands judgment against Nagel Rice, LLP, jointly and severally, in the amount of their damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Third Count
#### (Failure to Supervise as to Defendant Bruce Nagle, Esq.)

57. Plaintiff(s) incorporate each paragraph above as if repeated fully below.

58. Defendant Bruce Nagel had direct supervisory authority over Elliott L. Pell and other as yet unidentified employees of Nagel Rice who worked on Plaintiffs' underlying malpractice file (John Does 1-10).

59. Pell and the Does performed work on behalf of Nagel Rice in connection the handling of Plaintiffs' legal matter that is the subject of this dispute.

60. As the supervising attorney, Defendant Bruce Nagel had the duty to review and inquire of all subordinate attorneys and employees about the status of matters pending in the office, including Plaintiffs' case.

61. Defendant Bruce Nagel was negligent in failing to properly supervise or monitor the work of the subordinate attorneys and employees who worked on Plaintiffs' case.

62. As a direct and proximate result of Defendant Brice Nagel's failure to supervise, the subordinate attorneys and employees of Nagel Rice engaged in deficient and negligent work on behalf of Plaintiffs, causing the damages as previously referenced throughout this Complaint.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Bruce Nagel, Nagel Rice, LLP, and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Fourth Count
#### (Breach of Contract)

63. Plaintiff incorporates each paragraph above as if repeated fully below.

64. The conduct of the Nagel Rice Defendants constituted a breach of contract, oral, implied, and/or express as to the Plaintiff, the terms of which included, but were not limited to, the accepted standards of practice applicable to attorneys-at-law and law firms which were breached by the Nagel Rice Defendants.

65. As a direct and proximate result of the aforesaid breach of contract on the part of the Defendants, the Plaintiff was caused to sustain foreseeable and actual financial damages.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Nagel Rice, LLC, Bruce H. Nagel, Esq., Elliott L. Pell, Esq., and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Fifth Count
#### (Breach of Warranty and Covenant of Good Faith and Fair Dealing Against All Defendants)

66. Plaintiff incorporates each paragraph above as if repeated fully below.

67. The conduct of the Nagel Rice Defendants constituted breaches of warranties, both implied and express, and breaches of the implied covenant of good faith and fair dealing, and were in flagrant disregard of their professional duties to the Plaintiff's lawful interests and rights.

68. As a direct and proximate result of the aforesaid breach of warranties and covenant by Defendants, the Plaintifsf sustained foreseeable and actual financial damages.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Nagel Rice, LLC, Bruce H. Nagel, Esq., Elliott L. Pell, Esq., and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Sixth Count
#### (Legal Malpractice as to Defendants Dennis Estis and Greenbaum Rowe)

69. Plaintiff(s) incorporate each paragraph above as if repeated fully below.

70. At all times relevant herein, Defendant Dennis Estis was an attorney-at-law of the State of New Jersey, having been licensed to practice law in the State of New Jersey and employed by the Defendant firm Greenbaum Rowe.

71. At all times relevant herein, Defendant Dennis Estis, held himself out as being particularly skilled, experienced, and expert in providing services as an expert-witness in a legal-malpractice case.

72. Upon being retained as an expert witness for Plaintiff(s), Estis undertook and agreed to provide services as an attorney acting as an expert witness in a legal-malpractice case with either the implicit or explicit representation and understanding that Estis possessed and would exercise due care and would provide adequate and competent representation to Plaintiff(s).

73. Defendant had a duty to represent Plaintiff(s) and perform services as an expert witness in a legal-malpractice case with that degree of skill and care possessed by the ordinary member of the legal profession.

74. Estis, did in his representation of Plaintiff(s) and performance of services as an expert in a legal-malpractice case fail to meet this duty, breached the applicable standard of care, and were negligent in failing to, among other things, provide an appropriate Affidavit of Merit for Plaintiff's case and did fail to detect, uncover, and analyze obvious acts of legal malpractice by Mackovich in the handling of the Bomanite litigation, and did otherwise fail to conform to the standards of competence and reasonable skill in the legal profession that he represented himself as having and did fail to provide adequate and competent representation and expert-witness services to the Plaintiff(s).

75. As a direct and proximate result of the professional negligence and/or malpractice of the Estis, as referenced above, the Plaintiff(s) was caused to suffer damages.

76. Estis did neglect and/or mismanage the claim of the Plaintiff(s) and are responsible to her under *N.J.S.A.* 2A:13-4.

WHEREFORE, Plaintiffs demands judgment against Defendants Dennis Estis, Greenbaum Rowe, and John Does 1-10, jointly and severally, in the amount of her damages, together with interest, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Seventh Count
### (Breach of Contract as to Dennis Estis and Greenbaum Rowe)

77. Plaintiff incorporates each paragraph above as if repeated fully below.

78. The conduct of the Dennis Estis constituted a breach of contract, oral, implied, and/or express as to the Plaintiffs, the terms of which included, but were not limited to, the accepted standards of practice applicable to attorneys-at-law and law firms and attorneys serving as expert witnesses in legal-malpractice cases, which were breached by the Dennis Estis and Greenbaum Rowe

79. As a direct and proximate result of the aforesaid breach of contract on the part of the Defendants, the Plaintiff was caused to sustain foreseeable and actual financial damages.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Dennis Estis, Greenbaum Rowe Smith & Davis, LLP, and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Eighth Count
### (Breach of Warranty and Covenant of Good Faith
### and Fair Dealing Against Estis and Greenbaum Rower])

80. Plaintiff incorporates each paragraph above as if repeated fully below.

81. The conduct of the Defendants Dennis Estis and Greenbaum Rowe constituted breaches of warranties, both implied and express, and breaches of the implied covenant of good faith and fair dealing, and were in flagrant disregard of their professional duties to the Plaintiff's lawful interests and rights.

82. As a direct and proximate result of the aforesaid breach of warranties and covenant by Defendants, the Plaintiff sustained foreseeable and actual financial damages.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Dennis Estis, Greenbaum Rowe Smith & Davis, LLP, and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.


### Ninth Count
### (Respondeat Superior as to Defendant Greenbaum Rowe)

83. Plaintiff(s) incorporate each paragraph above as if repeated fully below.

84. The negligence and improper actions or inactions of Defendant Dennis Estis, as aforesaid, were made during the course of employment or within the scope of employment with the Defendant Greenbaum Rowe, and said Defendant firm is liable for the negligent and/or improper actions or inactions Defendant Dennis Estis and any of its as yet unidentified employees (John Does 1-10) under principles of *respondeat superior* or applicable principles of agency or applicable principles of partnership law, corporate law, or otherwise.

WHEREFORE, Plaintiff(s) demands judgment against Defendant Greenbaum Rowe Smith & Davis, LLP, in the amount of their damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

**Tenth Count**
**(Legal Malpractice as to Defendants Michael Spero, Neil Day, and Eckert Seamans)**

85. Plaintiff(s) incorporate each paragraph above as if repeated fully below.

86. At all times relevant herein, Defendants Michael Spero and Defendant Neil Day were attorneys-at-law of the State of New Jersey, having been licensed to practice law in the State of New Jersey.

87. At all times relevant herein, Spero and Day held themselves out as being particularly skilled, experienced, and expert in litigating legal-malpractice claims.

88. Upon assuming representation of Plaintiff(s), Defendants Spero and Day undertook and agreed to represent Plaintiff(s) with either the implicit or explicit representation and understanding that he possessed and would exercise due care and would provide adequate and competent representation to Plaintiff(s).

89. Defendants Spero and Day had a duty to represent Plaintiff(s) with that degree of skill and care possessed by the ordinary member of the legal profession.

90. Defendants Michael Spero and Neil Day did in his representation of Plaintiff(s) fail to meet this duty, breached the applicable standard of care, and were negligent in failing to, among other things, failing to perform the necessary investigation, obtain the relevant, necessary, and admissible fact and expert testimony, properly oppose Motions filed by Mackevich, and otherwise failed to detect and uncover conduct of Mackevich that constituted negligence in connection with the underlying representations. Spero and Day, among other things, also failed to present certain aspects of Mackevich's negligent conduct at trial to support St. Louis's malpractice claims, did fail to obtain the necessary and appropriate expert testimony to establish the underlying construction defects, did fail to adequately and competently present this information to the factfinder, did fail to advise that post-trial motions and appeals of the adverse decision should be pursued, and did otherwise fail to conform to the standards of competence and reasonable skill in the legal profession that he represented himself as having and did fail to provide adequate and competent representation to the Plaintiff(s).

91. As a direct and proximate result of the professional negligence and/or malpractice of the Michael Spero, as referenced above, the Plaintiff(s) was damaged.

92. Defendant Michael Spero did neglect and/or mismanage the claim of the Plaintiff(s) and are responsible to her under *N.J.S.A.* 2A:13-4.

WHEREFORE, Plaintiff demands judgment against Defendants Michael Spero, Neil Day, Eckert Seamans, and John Does 1-10, jointly and severally, in the amount of her damages, together with interest,

costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Eleventh Count
#### (Breach of Fiduciary Duty as to Michael Spero, Neil Day, and Eckert Seamans)

93. Plaintiff(s) incorporate each paragraph above as if repeated fully below. There was an attorney-client relationship between Plaintiff(s) and Defendants Michael Spero and Eckert Seamans.

94. A fiduciary relationship such as the attorney-client relationship is one of special trust and confidence.

95. The law requires that all dealings between an attorney and client be characterized by the utmost good faith, candor, and honesty.

96. An attorney must affirmatively disclose to his client all material facts bearing on the client's case, as well as the legal consequences flowing from the facts.

97. As such, Defendant(s) owed Plaintiff(s) a fiduciary duty of loyalty.

98. Defendants Michael Spero, Neil Day, and Eckert Seamans, in violation of RPC 1.2(a), 1.4(b) and (c), 1.5(a), RPC 1.8, and other principles of fiduciary-duty law, breached the fiduciary duty of loyalty owed to Plaintiff(s) by charging excessive legal fees in the course of the representation of Plaintiff, overcharging for various tasks, charging for work that failed to comply with accepted standards of care, and charging for work that was inappropriate, unnecessary, and unreasonably expensive.

99. Spero, Day, and Eckert Seamans did further breach this duty by inducing Plaintiffs to agree to hourly fees by inflating their expertise in handling Plaintiff's legal-malpractice claims.

100. Defendants Spero, Day, and Eckert Seamans did further breach their fiduciary duty by abusing their role as advisors to Plaintiffs in the search for replacement counsel, usurping Plaintiffs' opportunity to obtain successor counsel who was willing and able to continue the malpractice litigation on a contingent-fee basis, which would have been to the benefit of Plaintiffs.

101. Plaintiff(s) suffered harm and damages as a direct and proximate result of Defendant(s)' breach of fiduciary duty.

102. This conduct of Defendant(s) was malicious and/or engaged in with a wanton and willful disregard of Plainitff(s)' rights.

103. Defendants engaged in this conduct with reckless indifference to the consequences of their actions to Plaintiff(s).

WHEREFORE, Plaintiff(s) demands judgment against Defendants Michael Spero, Neil Day, Eckert Seamans, and John Does 1-10, jointly and severally, in the amount of her damages, together with interest,

punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Twelfth Count
### (Respondeat Superior)

104.     Plaintiff(s) incorporate each paragraph above as if repeated fully below.

105.     The negligence and improper actions or inactions of Defendants Michael Spero and Neil Day, as aforesaid, were made during the course of employment or within the scope of employment with the Defendant law firm of Eckert Seamans, and said Defendant firm is liable for the negligent and/or improper actions or inactions of Michael Spero and any of its employees (John Does 1-10) under principles of *respondeat superior* or applicable principles of agency or applicable principles of partnership law, corporate law, or otherwise.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Michael Spero, Neil Day, Eckert Seamans, and John Does 1-10, jointly and severally, in the amount of her damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Thirteenth Count
### (Failure to Supervise)

106.     Plaintiff(s) incorporate each paragraph above as if repeated fully below. There was an attorney-client relationship between Plaintiff(s) and Defendant(s).

107.     Defendant Michael Spero had direct supervisory authority over any subordinate lawyer or employees working on Plaintiff's file, including Defendant Neil Day and other unidentified John Doe Defendants who may have worked on Plaintiffs' file under Spero's supervision.

108.     As the supervising attorney, Michael Spero had the duty to review and inquire of all subordinate attorneys, including Neil Day, about the status of matters pending in the office, including Plaintiff's case/matter, and also to ensure that they were accurately and appropriately recording and billing their time for work on Plaintiffs' file.

109.     Defendant Michael Spero was negligent in failing to properly supervise or monitor the work of subordinate attorneys and employees, including Neil Day.

110.     As a direct and proximate result of Defendant Michael Spero's failure to supervise, the subordinate attorneys engaged in deficient and negligent work on behalf of Plaintiffs, causing the damages as previously referenced throughout this Complaint.

13

WHEREFORE, Plaintiff(s) demands judgment against Defendants Michael Spero, Neil Day, Eckert Seamans, and John Does 1-10, jointly and severally, in the amount of her damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Fourteenth Count
**(Breach of Contract as to Michael Spero, Neil Day, and Eckert Seamans)**

111.     Plaintiff incorporates each paragraph above as if repeated fully below.

112.     The conduct of Michael Spero, Neil Day, and Eckert Seamans constituted a breach of contract, oral, implied, and/or express as to the Plaintiff, the terms of which included, but were not limited to, the accepted standards of practice applicable to attorneys-at-law and law firms which were breached by the Nagel Rice Defendants.

113.     As a direct and proximate result of the aforesaid breach of contract on the part of the Defendants, the Plaintiff was caused to sustain foreseeable and actual financial damages.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Michael Spero, Neil Day, and Eckert Seamans, and John Does 1-10, jointly and severally, in the amount of their damages, together with interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Fifteenth Count
**(Breach of Warranty and Covenant of Good Faith
and Fair Dealing Against Michael Spero, Neil Day, and Eckert Seamans)**

114.     Plaintiff incorporates each paragraph above as if repeated fully below.

115.     The conduct of the Defendants Michael Spero, Neil Day, and Eckert Seamans constituted breaches of warranties, both implied and express, and breaches of the implied covenant of good faith and fair dealing, and were in flagrant disregard of their professional duties to the Plaintiff's lawful interests and rights.

116.     As a direct and proximate result of the aforesaid breach of warranties and covenant by Defendants, the Plaintiff sustained foreseeable and actual financial damages.

WHEREFORE, Plaintiff(s) demands judgment against Defendants Michael Spero, , Neil Day, Eckert Seamans, and John Does 1-10, jointly and severally, in the amount of their damages, together with

# EXHIBIT A

NAGEL RICE, LLP
103 Eisenhower Parkway
Roseland, NJ   07068
973-618-0400
Attorneys for Plaintiff

| | |
|---|---|
| ST. LOUIS, LLC,<br><br><br><br>Plaintiff,<br><br><br>against.<br><br><br>MACKEVICH, BURKE & STANICKI,<br>JAMES MACKEVICH AND<br>FRANK TUNNERO,<br><br>Defendants. | SUPERIOR COURT OF NEW<br>JERSEY<br>UNION COUNTY: LAW<br>DIVISION<br>DOCKET NO.: UNN-L-2817-<br>09<br><br><br><br><br>AFFIDAVIT OF MERIT |

STATE OF NEW JERSEY )
                    )   ss.:
COUNTY OF ESSEX     )

Dennis A. Estis, being duly sworn, deposes and says:

1.      I am a licensed attorney in the State of New Jersey since 1972.  I

have been a Partner in the firm of Greenbaum, Rowe Smith & Davis LLP since

1979 and I am chair of the firm's Construction Practice Group..

2.      I have been retained by the law firm of Nagel Rice, LLP, attorneys

for plaintiff St. Louis, LLC ("St. Louis"), to review St. Louis's claims against

defendants James Mackevich, Esq., and the law firm of Mackevich, Burke &

Stanicki (collectively "MBS").  These claims concern the legal services performed

by MBS in connection with the actions entitled St. Louis, LLC v. Final Touch

Glass & Mirror, Inc., et al., Docket Nos. SOM-L-1553-01 and A-6420-04T3, and

St. Louis, LLC v. Anthony & Sylvan Pools Corp., Docket Nos. SOM-L-97-01 and A-3754-04T3 ("St. Louis Actions").

3.  I make this Affidavit of Merit on behalf of St. Louis, pursuant to N.J.S.A. 2A:53A-27.

4.  I have reviewed the various pleadings and briefs, and other miscellaneous documents related to the St. Louis Actions.

5.  Based upon my review of the foregoing documents, it is my professional opinion, within a reasonable degree of legal certainty, that MBS did not meet the ordinary standard of professional care in the rendering of legal services in connection with the St. Louis Actions.

6.  I am familiar with this area of law as a result of my more than 36 years of professional experience, most of it devoted to construction law. I have no financial interest in the outcome of this action.

_____
Dennis A. Estis

Sworn to before me this
_____ day of December, 2009

_____
Notary Public of the State of New Jersey

**DEBORAH J. RING**
Notary Public of New Jersey
Commission Expires August 14, 2011

interest, punitive damages, costs of suit, counsel fees, and any other relief this Court deems just and equitable under the circumstances.

### Jury Demand

Plaintiff(s) demand a trial by jury.

### Designation of Trial Counsel

Plaintiff(s) designate Edward Grossi as trial counsel.

EDWARD GROSSI

Dated: March 17, 2016

### Certification under R. 4:5-1

The plaintiff hereby certifies that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding. The plaintiff further certifies that he has no knowledge of any contemplated action or arbitration proceeding which is contemplated regarding the subject matter of this action. The plaintiff further certifies that he is not aware of any other parties who should be joined in this action.

EDWARD GROSSI

Dated: March 17, 2016

15

**Appendix XII-B1**

| | | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|---|
| | **CIVIL CASE INFORMATION STATEMENT** **(CIS)** | PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| | | CHG/CK NO. |
| | Use for initial Law Division Civil Part pleadings (not motions) under *Rule* 4:5-1 **Pleading will be rejected for filing, under *Rule* 1:5-6(c), if information above the black bar is not completed or attorney's signature is not affixed** | AMOUNT: |
| | | OVERPAYMENT: |
| | | BATCH NUMBER: |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Edward Grossi | (973) 419-6481 | Somerset |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
|---|---|
| Law Office of Edward R. Grossi, LLC | L- 389-16 |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| 7 North Mountain Ave. Montclair, NJ 07042 | Complaint |
| | JURY DEMAND ■ YES ☐ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| St. Louis, LLC, John Boulton | St. Louis, LLC, John Boulton v. Nagel Rice, LLP, Bruce H. Nagel, Esq., Elliott L. Pell, Esq., Dennis Estis, Esq., Greenbaum Rowe Smith & Davis, LLP, Eckert Seamans, Michael Spero, Neil Day, John Does 1-10 |

| CASE TYPE NUMBER (See reverse side for listing) 607 | HURRICANE SANDY RELATED? ☐ YES ■ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ■ YES  ☐ NO |
|---|---|---|
| | | IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ YES  ■ NO | IF YES, LIST DOCKET NUMBERS |
|---|---|

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ YES  ■ NO | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)   ☐ NONE   ■ UNKNOWN |
|---|---|

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ■ YES  ☐ NO | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE     ☐ FRIEND/NEIGHBOR    ☐ OTHER (explain) ☐ FAMILIAL               ☐ BUSINESS              Attorney/Client |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ■ YES   ☐ NO |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ YES  ■ NO | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED? ☐ YES  ■ NO | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:

Effective12-07-2015, CN 10517-English

**Side 2**



# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule 4:5-1*

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151  NAME CHANGE
175  FORFEITURE
302  TENANCY
399  REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502  BOOK ACCOUNT (debt collection matters only)
505  OTHER INSURANCE CLAIM (including declaratory judgment actions)
506  PIP COVERAGE
510  UM or UIM CLAIM (coverage issues only)
511  ACTION ON NEGOTIABLE INSTRUMENT
512  LEMON LAW
801  SUMMARY ACTION
802  OPEN PUBLIC RECORDS ACT (summary action)
999  OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305  CONSTRUCTION
509  EMPLOYMENT (other than CEPA or LAD)
599  CONTRACT/COMMERCIAL TRANSACTION
603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605  PERSONAL INJURY
610  AUTO NEGLIGENCE – PROPERTY DAMAGE
621  UM or UIM CLAIM (includes bodily injury)
699  TORT – OTHER

**Track III - 450 days' discovery**
005  CIVIL RIGHTS
301  CONDEMNATION
602  ASSAULT AND BATTERY
604  MEDICAL MALPRACTICE
606  PRODUCT LIABILITY
607  PROFESSIONAL MALPRACTICE
608  TOXIC TORT
609  DEFAMATION
616  WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617  INVERSE CONDEMNATION
618  LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156  ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303  MT. LAUREL
508  COMPLEX COMMERCIAL
513  COMPLEX CONSTRUCTION
514  INSURANCE FRAUD
620  FALSE CLAIMS ACT
701  ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 271 | ACCUTANE/ISOTRETINOIN | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 291 | PELVIC MESH/GYNECARE |
| 278 | ZOMETA/AREDIA | 292 | PELVIC MESH/BARD |
| 279 | GADOLINIUM | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 282 | FOSAMAX | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 299 | OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR |
| 287 | YAZ/YASMIN/OCELLA | 300 | TALC-BASED BODY POWDERS |
| 288 | PRUDENTIAL TORT LITIGATION | 601 | ASBESTOS |
| 289 | REGLAN | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics."

**Please check off each applicable category**   ☐ **Putative Class Action**   ☐ **Title 59**

Effective 12-07-2015, CN 10517-English

# EXHIBIT D



Nicholle Harrison
Senior Claims Analyst
V (860)284-1980
F (860)284-1981
E Nicholle.Harrison@awac.com

VIA E-MAIL

April 08, 2016

Mr. Jay Rice, Esq.
Nagel Rick, LLP
103 Eisenhower Pkwy
Roseland, NJ 07068
jrice@nagelrice.com

Re:   Insured:           Nagel Rice LLP
      Insurer:           Allied World Insurance Company
      Policy No.:        0309-9751
      Policy Period:     01/21/2016 to 01/21/2017
      Limit:             $2,000,000
      Retention:         $50,000
      Subject:           St. Louis, LLC; John Boulton
      Ref. No.:          2016006975

Dear Mr. Nagel:

I am writing on behalf of Allied World Insurance Company in connection with the above referenced matter. The purpose of this letter is to provide our initial coverage evaluation under the Lawyers Professional Liability Policy that Allied World issued to Nagel Rice LLP ("Firm" or "**Insured**") for the Policy Period of January 21, 2016 to January 21, 2017 (the "**Policy**"). As set forth below, we regret to inform you there is no coverage for this matter.

We recommend that you review the Policy with this letter, which does not modify any terms and conditions of the Policy. Please note that the words that appear in **bold** print are defined in the Policy. The Policy provides Limits of Liability of $2,000,000 each **Claim** and $2,000,000 aggregate for all **Claims** subject to a $50,000 per **Claim** Retention.[1]

We have received and reviewed the Complaint that was filed against you and others in the Superior Court of New Jersey for Somerset County on or about March 17, 2016. The complaint alleges that the Plaintiffs retained Nagel Rice, LLC; to represent them in claims against Attorney James Mackevich who they allege were negligent in representing them in 3 separate lawsuits relative to construction/development projects. The Complaint further alleges that your representation fell below the standard of care. The Complaint includes causes of action for I. Legal Malpractice as to Nagel Rice and Elliot Pell; II. Respondeat Superior as to Nagel Rice; III. Failure to Supervise as to Bruce Nagle; IV. Breach of Contract as to Nagel Rice, Bruce Nagel and Elliot Pell; V. Breach of Warranty and Covenant of Good Faith and Fair Dealing as to all defendants, VI. Legal Malpractice as to Dennis Estis and Greenbaum Rowe; VII. Breach of Contract as to Dennis Estis and Greenbaum Rowe; VIII. Breach of Warranty and Covenant of Good Faith and Fair Dealing as to Dennis Estis and Greenbaum Rowe; IX. Respondeat Superior as to Greenbaum

---

[1] Per Policy Section V. B., amended by Endorsement 1 and 3, the **Retention** applies to **Damages** only.

ALLIED WORLD INSURANCE COMPANY          1690 New Britain Avenue  T. 469 284 1300    B. info@awac.com
                                        Suite 101                F. 469 284 1301    www.awac.com
                                        Farmington CT 06032
                                        U.S.A.

April 08, 2016
Page 2 of 1

Rowe; X. Legal Malpractice as to Michael Spero, Neil Day and Eckert Seamans; XI. Breach of Fiduciary Duty as to Michael Spero, Neil Day and Eckert Seamans; XII. Respondeat Superior as to Michael Spero, Neil Day and Eckert Seamans and XIII. Failure to Supervise as to Michael Spero and seeks monetary damages, interest, cost and attorney's fees.

Insuring Agreement I.A., of the Policy, provides that Allied World:

> … will pay on behalf of an **Insured**, subject to the applicable Limit of Liability set forth in Item 3.I. of the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out of any of the following **Wrongful Acts** by an **Insured** first made during the **Policy Period** or any Extended Reporting Period:
>
> 1. during the **Policy Period**; or
>
> 2. on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:
>
>> (a) the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and
>> (b) prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and
>> (c) there is no policy that provides insurance to the **Insured** for such liability or **Claim.**

Subject to the applicable Limit of Liability set forth in the Declarations, the **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

Policy Section III.C., as amended by Endorsement 1, defines **Claim** to include:

> 1. any written notice or demand for monetary relief or **Legal Services**; or
> 2. any civil proceeding in a court of law;
> 3. any administrative proceeding, other than a **Disciplinary Proceeding**; or
>
> made to or against any **Insured** seeking to hold such **Insured** responsible for damages for a **Wrongful Act.**
>
> A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable, or non-pecuniary relief or remedies of any type.
>
> A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim.**

April 08, 2016
Page 5 of 4

Legal Services is defined in Section III.P. as those services performed on behalf of the **Named Insured** for others by an **Insured** as a licensed lawyer in good standing, guardian, trustee, fiduciary or escrow agent… but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer . Pursuant to Section III.Q., **Legal Services Wrongful Act** means "an actual or alleged act, error or omission by an **Insured**,sol ely in the performance of or failure to perform **Legal Services**".

According to the definitions cited above, the Complaint dated March 17, 2016 constitutes a **Claim** against the **Insured** under the Policy. However, there is no coverage for this matter for reasons indicated below.

It is the position of Allied World that the Insuring Agreement has not been satisfied. The present policy period of January 21, 2016 to January 21, 2017 is the first policy period with Allied World. As such it is a condition precedent that "prior to the inception date of the first policy issued by the Insurer if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**." It is our understanding that you had a basis to believe that a claim would be pursued as early as May 24, 2010 as evidenced by the Motion to Dismiss filed on May 24, 2010. The Motion requests that portions of the Complaint be dismissed based upon the failure to comply with N.J.S.A. 2A:53A-27, which is the Affidavit of Merit statute. Your knowledge of the basis of a **Claim** is further evidenced by the filing of the Notice of Cross Motion dated June 8, 2010 which requests the court allow Nagel Rice, LLC and Elliot Pell withdraw as counsel for St. Louis, LLC and further requests the adjournment of the Defendant's Motion to Dismiss until such time as new counsel can be retained. It is clear that you were aware of the issues with the Affidavit of Merit prior to your withdrawal as counsel and had a basis to foresee that this might reasonably be expected to be the basis of a **Claim** against an **Insured**. As a result Allied World must deny coverage as the Insuring Agreement has not been satisfied.

As we believe the preceding to be dispositive of coverage, Allied World will provide neither a defense nor indemnity for this matter. Allied World's coverage position is based on the information currently available to it. If you believe that Allied World has incomplete or incorrect information, please let us know and provide us with any relevant documentation, at which time we would be pleased to review our position.

Please note further that Allied World fully reserves all of its rights under the Policy and applicable law, that the above discussion is not intended to be exhaustive, and there may be other terms and conditions of the Policy which, although not specifically mentioned in this letter, may apply to this matter. Allied World reserves the right to assert any additional Policy term or condition that might be applicable or as circumstances may warrant as additional information becomes available. Allied World's actions in investigating, evaluating, and/or monitoring this matter should not be construed as a waiver, estoppel, or other relinquishment of Allied World's rights to limit or deny coverage, nor as any admission of any obligation under the Policy.

Should you dispute any part of the position set forth in this letter, please be advised that Allied World has instituted an internal appeals process for the purpose of reviewing this decision. If you find it necessary to seek an internal appeal, please notify the Allied World National New Jersey Internal Appeals Administrator in writing, e-mail or facsimile by contacting the following:

New Jersey Internal Appeals Administrator
Allied World Assurance Company
1690 New Britain Avenue
Farmington, Connecticut 06032

April 08, 2016
Page 4 of 4

Fax:  860-284-1307<br>
E-mail:  NJAppeals@awac.com

If you have any questions regarding the foregoing, please feel free to contact me.

Very truly yours,

Nicholle Harrison

cc:    Harley Ratner
       harley@dopartners.com